**UNITED STATES of America,
Appellee,**

v.

**Nicholas LaSORSA and Salvatore Caio,
Defendants-Appellants.**

**No. 795, Docket 73-1210.**

United States Court of Appeals,
Second Circuit.

Argued April 17, 1973.

Decided June 11, 1973.

Arthur J. Viviani, Franklin Velie, Richard J. Davis, John W. Nields, Jr., Asst. U. S. Attys., Whitney North Seymour, Jr., U. S. Atty., for appellee.

Jay Goldberg, New York City, for defendant-appellant LaSorsa.

H. Elliot Wales, New York City, for defendant-appellant Caio.

Before CLARK, Associate Justice,[*] and WATERMAN and FEINBERG, Circuit Judges.

WATERMAN, Circuit Judge:

After a five day jury trial in the United States District Court for the Southern District of New York, the defendants-appellants, Nicholas LaSorsa and Salvatore Caio, charged in a one-count indictment, were convicted of conspiracy to sell heroin without the buyer's written order form in violation of Title 26, United States Code, Sections 4705(a) and 7237(b), and were sentenced to mandatory prison terms of five years each.[1] At the trial, the Government, in seeking to establish the defendants' guilt, rested its case primarily on the testimony of its star witness, James Brown, a convicted felon then out on parole from a seven year prison term imposed on him by a New York state court for robbery and conspiracy to kidnap. Brown was named in the indictment as a co-conspirator of the defendants although he was not charged as a codefendant. Upon taking the stand as the Government's key witness, Brown testified that from May 1968, to April 1969, he was employed on a commission basis by the defendants to sell heroin on the defendants' account at prices ranging from $26,000 to $30,000 per kilo. He stated that during this period he was able to arrange a number of transactions in New York City and that for each kilo he sold he received from the defendants a $1,000 sales commission. He also testified that at his initial introductory meeting with the defendants he was instructed by them that whenever he had a buyer who wanted heroin he was to contact the defendants by calling LaSorsa at LaSorsa's place of business, Dale Oldsmobile, and asking for a Mr. Clark. At this first introductory meet-

ing, after LaSorsa had instructed him to call Dale whenever he had a purchaser, LaSorsa also handed him a business card with LaSorsa's private telephone number at Dale handwritten on the card, and this card was introduced into evidence as a government exhibit. He further stated that during the course of his subsequent business relationship with the defendants he had called LaSorsa at Dale many times to inform him that he had set up buys and that he had even visited Dale on about thirty occasions to meet with LaSorsa personally. Brown concluded his testimony by detailing the ways in which he had brokered large quantities of heroin for the defendants during his 11 months of association with them. During this part of his testimony he spoke at length, and apparently convincingly, about the details of his many transactions, and especially about his sales to two retailers of heroin, "Goldfinger," his Harlem connection, and Luther Hazel, the Government's next witness.

Hazel had been named in one of the overt acts listed in the indictment as futhering the alleged conspiracy, as having received heroin from Brown, and, in the bill of particulars the Government furnished the defense, was characterized as one who "might be considered" a co-conspirator. Hazel's testimony related to an incident which occurred after he had made his first, and only, purchase from Brown. As Hazel's workers had been unable to resell the drugs on the street quickly enough to raise sufficient cash to pay the purchase price of $30,-000 he did not make his payment to the defendants on the day it was due. Shortly thereafter he met with Brown and the defendants in an automobile, and while Caio held him at gunpoint in the car LaSorsa demanded payment and, to drive the point home, hit him in the

---

[*] Associate Justice of the United States Supreme Court, Retired, sitting by designation.

1. This was the defendants' second trial upon this indictment. The first ended in a mistrial when the jury was unable to reach a verdict. The first trial began on April 27, 1972 and ended on May 5, 1972, and the trial from which this appeal was taken commenced on October 31, 1972 and concluded on November 6, 1972.

face several times. Eventually Hazel paid $23,500 on account, leaving unpaid a balance of $6,500, plus $2,000 or so borrowed to pay Hazel's packaging helpers. LaSorsa told Brown to forget this balance.

The remainder of the Government's direct case was devoted to introducing evidence tending to support the testimony that had been given by Brown. In order to establish the fact that Caio had been involved with narcotics on other occasions, the Government introduced the testimony of Neil McMillan, a three time felon then serving a Virginia state sentence for his third conviction. McMillan stated that three times during 1968 and 1969 Caio, as part of a separate retailing business, had employed him at a salary of $5,000 a week to dilute and package heroin. Also, in order to verify a Brown statement that he and Tony LaSorsa, brother of Nicholas LaSorsa, had counted in the apartment of Audrey Flynn, Tony's girlfriend, money they had received from "Goldfinger," the government produced Flynn, who stated that she had indeed seen Brown and Tony counting money in her apartment.

Neither of the defendants testified in his own behalf, but the defense attempted to prove by other witnesses that the testimony of Brown and Hazel was not to be believed. The owner of Dale Oldsmobile and a current and a former employee of Dale (both of whom had worked at the telephone switchboard) established the fact that no one named Mr. Clark had ever worked at Dale and that, to their knowledge no one had ever called in and asked for a Mr. Clark. Although this testimony was meant to show that Brown was lying when he said he had called Dale many times and had asked for Mr. Clark, the prosecution established on cross-examination that LaSorsa had a private line at Dale and that calls from Brown to him probably would go through the private line noted on the card he gave Brown rather than through the main switchboard. The defense also attempted to prove that Brown's testimony was not to be be-

lieved because it differed from the story he had given to an FBI agent while Brown was an inmate at Sing Sing Prison. Although the defense was able to establish that Brown, when he first spoke to the agent at Sing Sing on July 9, 1970, made some statements that differed from portions of his trial testimony, the Government, on cross-examination of the agent, showed that in most respects the July 9 story was substantially the same as the testimony given at trial, and that, in any event, the story Brown gave at five subsequent meetings in Sing Sing with the same FBI agent was exactly the same story he gave at trial. In any event, the jury believed Brown's trial testimony, and, after one day of deliberation, reached a guilty verdict as to both defendants.

In urging a reversal of their convictions the defendants contend: (1) that the prosecutor's summation was prejudicial and denied the defendants a fair trial, for it unfairly placed the prestige of the United States Attorney and the United States Bureau of Narcotics behind the testimony of Brown; (2) that the lower court committed "plain error" in failing to charge the jury that accomplice testimony should be "scrutinized with care and caution"; (3) that the lower court erred when it restricted the efforts the defense was making in the cross-examination of Brown and Hazel to establish the bias of these co-conspirators against the defendants; and also erred when it permitted Brown to assert his privilege against self-incrimination at one point during his cross-examination; and (4) that the defendants' sixth amendment right to a jury trial was abrogated by the substitution without the defendants' prior consent of Judge Bauman for Judge Gagliardi as presiding judge on the final day of the trial.

Having carefully reviewed the trial record we find no merit in these contentions, and we affirm the convictions.

I

The defendants first claim that they were denied a fair trial be-

cause the prosecutor stated in his summation that the jury should acquit if it believed the Government "framed" the defendants. They claim that the argument was uncalled for by any defense argument and that it unfairly prejudiced the defense in that it bolstered the credibility of the Government's witnesses by placing the Government's prestige behind them. We agree with the defendants that a prosecutor should not bolster the Government's case by placing the prestige of the United States Government behind the witnesses for the prosecution. See United States v. Puco, 436 F.2d 761, 762 (2 Cir. 1971). Here, by structuring its argument in such a way as to suggest to the jury that if it should vote for acquittal it would be implicitly agreeing with the defendants' insinuations that the prosecution had "framed" the defendants, it is arguable that the prosecution did place its own prestige behind its witnesses.[2] If the strategy behind this approach was to introduce prejudicial new matter into the case by suggesting that the defense had made insinuations of prosecutorial misconduct that the defense had not really made, it might be that the prosecutor's conduct was prejudicially improper. However, here, it is manifest from even a casual reading of the jury arguments of defense counsel that the prosecution was only meeting the defense on a level of the defense's own choosing. The defense had, indeed, insinuated precisely the type of prosecutorial misconduct which the prosecutor was attempting to refute in his argument to the jury, so quite justifiably, he argued responsively that the Government had not "framed"

the defendants and that, if the jury thought the Government had done so, it should acquit them. The defense arguments to the jury are replete with characterizations of the Government's witnesses as "stars of a little play," "creeps," "the gem of gems" (reference to Brown), and "what a beauty" (reference to Hazel)—all open insinuations that the Government had without justification, staged a framed prosecution. Moreover, the decision to prosecute the defendants is labeled a "desperate act" and it is argued that the Government used Brown to set up a deal to get Caio and LaSorsa because it needed to obtain convictions to respond to the public's outcry against narcotics pushers.[3] Also it is suggested that the Government had given favors to the witnesses in return for their assistance although no evidence was introduced during the trial that the witnesses had actually received any. In view of these attacks against the very integrity of the prosecution the prosecutor was certainly entitled to reply with rebutting language suitable to the occasion. See United States v. Benter, 457 F.2d 1174 (2 Cir.), cert. denied, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 82 (1972); United States v. Kravitz, 281 F.2d 581, 586 (3 Cir. 1960), cert. denied, 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372 (1961). The defense allegation that the prosecutor's summation was unfairly prejudicial is without merit.

## II

█ The defendants' next claim is that the trial judge committed reversible error in failing to instruct the jury that

---

2. For example, during his summation the prosecutor made the following statement:
   Is that what you believe happened? Do you believe Governmental agencies went around and told these people to frame up innocent men? That is an outrageous charge, and if you believe it, acquit, acquit with the Government's blessing, because that is an outrageous thing to do, and nobody in this court, in the House of America, should be convicted on a frame-up of evidence put together in that way. (R. 562).

3. For example, LaSorsa's lawyer during his argument to the jury, said:
   Narcotics is the biggest thing there is in this country right now. And all of us share the same concern for it. All of us share that concern. What does that force the Government to do? It forces the Government to barter and exchange and deal with people like McMillan and Hazel and Brown, and if you do not believe a deal was made in this case with James Brown, then we failed here as attorneys. (R. 541).

in reviewing the evidence it should "scrutinize with care and caution" the uncorroborated testimony of the accomplice witnesses Brown and Hazel. The trial record does not disclose that the defendants' lawyers brought to Judge Gagliardi's direct attention that they wanted him to include such an accomplice witness charge in his instructions to the jury. Moreover, it is conceded by the defendants that they did not except to the charge after Judge Gagliardi had delivered it or that they then suggested such a charge. Despite this, however, they now argue that this court should find that Judge Gagliardi's failure to deliver an accomplice witness charge sua sponte was "plain error" and that, therefore, we should reverse the convictions. We do not agree.[4] Although we have said that in circumstances where the testimony of accomplice witnesses is an important part of the Government's case the trial judge should, as the recommended practice, instruct the jury to the effect that the testimony of the accomplice witnesses should be "scrutinized with care and caution," we have never required this precise charge to be given unless, by failing to give it, the defendants suffered substantial prejudice. See United States v. Abrams, 427 F.2d 86 (2 Cir. 1970), cert. denied, 400 U.S. 832, 91 S.Ct. 64, 27 L.Ed.2d 63 (1970); United States v. Cianchetti, 315 F.2d 584, 592 (2 Cir. 1963). We have carefully reviewed the charge Judge Gagliardi delivered to the jury and the statements made to the jury by the defendants' attorneys during their final arguments, and we are persuaded that the defendants were not prejudiced by Judge Gagliardi's failure to caution the jury specifically that accomplice testimony must be "scrutinized with care and caution." Although these particular words were not used, the certain import of the charge taken as a whole was that the jury should be particularly careful in evaluating the testimony of Brown, Hazel and McMillan. Thus, Judge Gagliardi first reminded the jury that it must ask itself as to each witness whether the witness appeared to be "truthful, candid, frank and forthright," or "evasive, shifty, or otherwise suspect." Then Judge Gagliardi reminded the jury that it must consider as to each witness whether his testimony was buttressed or impaired by corroborative or contradictory testimony of some other witnesses, or whether it had been impeached by a showing that it was inconsistent with prior statements, thus indirectly alluding to the fact that the defense had tried to attack Brown by having an FBI agent testify that Brown's trial testimony contradicted certain things he had told the agent on July 9 in a Sing Sing Prison interview. Then Judge Gagliardi alerted the jury to the fact that a witness could be impeached by a showing that the witness had been convicted of prior felonies, or by a showing that he had a motive to lie. In this part of the charge Judge Gagliardi stated specifically that Hazel, Brown, and McMillan had been convicted of prior felonies, naming all three of these government witnesses by name. Then Judge Gagliardi took the significant additional step of warning the jury that much of the testimony it had heard from the Government had come from witnesses who "were themselves involved in the alleged conspiracy or in the achievement of its objects." And, to drive this point home, he also noted that: "One of those witnesses, James Brown, is specially named in the indictment as a co-conspirator, although not as a defendant."

From these extensive instructions on the issue of the credibility of the Gov-

---

4. As discussed in text infra we find no "plain error" affecting the substantial rights of either defendant from the failure of the trial judge to instruct the jury in the exact language we have recommended in United States v. Abrams, text infra; but, in any event, counsel, in disregard of the mandate of Rule 30, Fed.R.Crim.P., did not give the judge the benefit of their approach to the subject so that he could comply with it if he wished to do so. See, e. g., Pagliochini v. United States, 105 U.S.App.D.C. 110, 264 F.2d 583 (1959).

ernment's witnesses, we think it is clear that the jury was fully and fairly apprised of the fact that it was to use great caution in weighing the testimony of Brown, Hazel, and McMillan. Moreover, when it is recalled that these instructions were given after defense counsels' pleas, made during their final arguments to the jury, not to believe Brown, Hazel and McMillan because of their past records and their motives to lie, the conclusion becomes even more inescapable that the jury was fully alerted to the necessity of carefully and cautiously scrutinizing the accomplice testimony. See U. S. v. Cianchetti, *supra* at 592 of 315 F.2d. Accordingly, we find that the defendants were not substantially prejudiced by the trial judge's charge, and that no showing of "plain error" has been made.[5]

### III

■ In its extensive efforts to discredit the testimony of Brown and Hazel the defense emphasized the fact that both of these witnesses had substantial reasons to cooperate with the Government, even to the extent of perjuring themselves.[6] The defense brought this to the jury's attention by introducing, during cross-examination, evidence that the witness may have been granted favors by the Government in return for their testimony (this evidence was refuted) and also by showing that Hazel and Brown may have harbored particular grudges against the defendants because the defendants had allegedly threatened to kill them if they did not keep away from Tony LaSorsa, the defendant LaSorsa's brother; and, further, as to Hazel, that LaSorsa had hit him because he had failed to pay for his heroin on time. At one point during the cross-examination of Brown, LaSorsa's attorney with a view to establishing motive, asked Brown the following question: "He [defendant LaSorsa] did not tell you to stay away from his brother or he would kill you?" After the question was asked the Government objected and Judge Gagliardi sustained the objection. The defendants argue that it was error to disallow this question because, by disallowing it, the trial judge unfairly limited the defense in its cross-examination of the Government's key witness, Brown. However, this argument is patently frivolous, for when the question is read in connection with the string of questions, noted in the margin, of which it was one, it is obvious that the objectionable question was clearly repetitious.[7]

5. Although relatively unimportant in view of our holding here, we also note that as to Caio the testimony of Hazel and Brown implicating him was corroborated by McMillan.

6. The defense strongly suggested that the Government had arranged for Brown to obtain an expedited parole from the seven year sentence he was serving for a 1969 New York State conviction; that Hazel was permitted to plead to an income tax charge in settlement of an outstanding federal indictment for a narcotics offense; and that McMillan was to receive government help in securing for him an early parole from the serving of his Virginia sentence. These men denied that the prosecutor had made any promises of favors and there was no evidence introduced at trial to show that the prosecutor had, indeed, made any promises; but of course Brown and Hazel were not indicted with

Caio and LaSorsa for their respective roles in the charged conspiracy.

7. Q. You [Brown] were in the car when Nicholas LaSorsa hit Luther Hazel, weren't you?

A. Yes, I was.

Q. And Nicholas LaSorsa told you at that time if you did not stay away from his brother Tony, you and Hazel, he'd kill you, didn't he?

A. I'm not afraid of Nicholas La Sorsa.

Q. Did he tell you that?

A. He did not tell me that, no.

Q. He did not tell you that?

A. He did not.

Q. He did not tell you to keep away from his brother Tony?

Prosecutor: Objection.

The Court: Sustained. Next question.

■ The defense pursued the same line of questioning in an effort to establish Hazel's motive. The defense argues that Judge Gagliardi committed reversible error by limiting its cross-examination of Hazel when he sustained the Government's objection to the following question: "Did Nicholas LaSorsa, when he slapped you, [Hazel] tell you that if you and Jimmy Brown did not stay away from his brother Tony he was going to kill the two of you?" We agree with the Government that this ruling was correct as the question assumed an unsubstantiated fact—that Hazel had previously been with LaSorsa's brother Tony. Moreover, even if the ruling were incorrect, the defense was not unfairly prejudiced by its inability to pursue this particular question inasmuch as throughout the trial it had had more than an ample opportunity, of which it took full advantage, to prove that Hazel had substantial reasons to lie. See United States v. Blackwood, 456 F.2d 526 (2 Cir. 1972), cert. denied, 409 U.S. 863, 93 S.Ct. 154, 34 L.Ed.2d 110 (1972).

■■ Finally, the defendants object to a ruling permitting Brown to refuse to answer, on the ground that the answer might incriminate him, a question put to him by the defense during cross-examination. The defense wanted to bring out that Brown may have committed criminal acts for which he may not have been prosecuted so that it could establish that the reason he testified for the Government was so that the Government would not prosecute him for these past criminal acts of which it had knowledge. Following a conference out of the presence of the jury, the judge and the defense attorneys reached an understanding that for the purpose of establishing Brown's motives in testifying against the defendants the defense could ask Brown about any prior criminal acts he may have committed for which he had not been prosecuted but which were known to the Government. At the same time the judge made clear that he would warn Brown of his constitutional right against self-incrimination if the defense opened the subject. When the jury returned and the cross-examination of Brown commenced, the defense asked the following question: "Mr. Brown, other than the convictions which you have related to the jury, which you have been convicted of, are there any other criminal acts that you have committed?" At this point the Government objected to the form of the question on the ground that it was not phrased in such a way as to alert the jury that the testimony was of limited admissibility and that it was being permitted into evidence only to throw light on the issue of Brown's motives. Judge Gagliardi overruled the government objection, and instructed Brown that he did not have to answer the question if he thought his answer would be incriminating. Thereafter Brown refused to answer the question. The defendants took exception to Brown's refusal to answer—and to Judge Gagliardi's upholding of his refusal—on the ground that during the first trial, which had ended in a hung jury, Brown had admitted committing a robbery with Tony LaSorsa, and that the admission precluded him at this second trial from interposing his fifth amendment privilege as to this particu-

Q. Did you refuse to answer yesterday when Mr. Goldberger asked you where you lived in Washington, D. C.? Yes or no.
A. Let me explain it to you.
Q. Just yes or no. Did you refuse to answer?
A. Yes, I did.
Q. Did you tell this court yesterday that you were afraid that Mr. LaSorsa or his family might learn where you lived? Just yes or no. Did you say that yesterday?
A. Yes, I did.
Q. But now you are saying you are not afraid?
A. That's right.
Q. He did not tell you to stay away from his brother or he would kill you?
Prosecutor: Objection.
The Court: Sustained.

lar criminal act.[8] They maintain that as he had already admitted the act at the former inconclusive trial he had thereby waived his right to exercise his fifth amendment privilege at this second trial. However, even assuming *arguendo* that the disclosure during the prior trial of this particular robbery precluded Brown during this second trial from refusing to answer whether he did commit that robbery, an issue we need not discuss,[9] the question he was asked went far beyond an inquiry of whether he had committed a robbery with Tony LaSorsa. Brown was not required to answer the broad question he was asked, and the trial judge, in view of this fact, quite properly warned him of his constitutional right. See Wigmore, Evidence § 2270(1) (1961 edition).

## IV

■■■■ The defendants claim that they were deprived of their sixth amendment right to a jury trial because on the final day of the trial Judge Bauman sat in for Judge Gagliardi because Judge Gagliardi had become ill. This claim is briefly disposed of. Judge Gagliardi presided at the trial from its inception, October 31, 1972, until the end of the first day of the jury's deliberations, Friday, November 3. Over the weekend he became ill and on Sunday evening he telephoned Judge Bauman at his home and asked Judge Bauman to preside over the remainder of the trial. Judge Bauman indicated he would do so if he could comply with the requirement of Rule 25, Fed.R.Crim.P. that he certify he was fa-

miliar with the trial record. Monday morning Judge Bauman held a conference with counsel in the robing room and he certified that he was familiar with the record. He also asked counsel whether there were any objections to his presiding over the remainder of the trial. There were no objections. Judge Bauman then informed counsel that the jury had requested to have some trial testimony read back to it and counsel agreed on the portion to be read back. They entered the courtroom, the jury was brought in, and Judge Bauman explained to the jurors why he was sitting for Judge Gagliardi. At this time neither of the defendants voiced any objection to the substitution of the judges, although both of them were seated in the courtroom. Thereafter the requested testimony was read back and the jury retired. Later the foreman sent a second note to Judge Bauman requesting the reading of some additional testimony. The jury was then brought back a second time, it heard the testimony, returned to the jury room, and shortly thereafter returned a guilty verdict as to each defendant. After the announcement of the verdict Judge Bauman stated that, as Judge Gagliardi was more familiar with the facts of the case than he, he would leave the sentencing to Judge Gagliardi unless the defendants objected. There was no objection and Judge Gagliardi imposed sentence on January 15, 1973.

From this account it is evident that Judge Bauman's service as a substitute judge was an extremely limited one.

8. Clearly, the defendants have standing to bring this issue before this court. See 8 Wigmore, Evidence § 2270(2) (1961 edition).

9. See our holding in United States v. Seewald, 450 F.2d 1159, 1164 (2 Cir. 1971) (Oakes, J., dissenting), cert. denied, 405 U.S. 978, 92 S.Ct. 1206, 31 L.Ed.2d 253 (1972). There, the holding in United States v. Miranti, 253 F.2d 135 (2 Cir. 1958) that a witness who testifies before a grand jury about a criminal act in which he was involved may assert his fifth amendment privilege against self-incrim-

ination when asked to acknowledge this testimony at a later grand jury proceeding, is held to be limited to similar fact situations. See also Ellis v. United States, 135 U.S.App.D.C. 35, 416 F.2d 791, 800–805 (1969), where the court held, Wright, J., dissenting, that a witness who voluntarily testified before a grand jury without invoking his privilege against self-incrimination, of which he has been advised, waives the privilege and may not thereafter claim it when he is later called to testify as a witness at the trial on the indictment returned by the grand jury.

After certifying in accordance with the Rules that he was familiar with the trial record Judge Bauman received two notes from the foreman of the jury, had portions of the trial testimony read back to the jury (which portions were agreed upon by counsel) and received the jury's verdict. He referred the sentencing and the disposition of any post-trial motions to Judge Gagliardi. He made no rulings and committed no acts which could have adversely affected the defendants' rights in any way. Indeed, the defendants do not argue that they were prejudiced by the substitution, but only argue that the substitution was unconstitutional *per se*. However, even assuming that the defendants themselves, despite their inaction and despite the consent of their attorneys, did not themselves consent to the substitution,[10] the claim is without merit under the circumstances obtaining here. See Connelly v. United States, 249 F.2d 576 (8 Cir. 1957), cert. denied, 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed.2d 716 (1958). The only authority cited by the defendants for the proposition that, irrespective of whether the defense was prejudiced, an unconsented-to substitution of one judge for another violates the sixth amendment, is our court's opinion in Freeman v. United States, 227 F. 732 (2 Cir. 1915). We are not bound by the holding there for, that case, decided over fifty-five years ago, rested on a principle subsequently repudiated by the United States Supreme Court in Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930)—the principle that a defendant may not waive his right to a jury trial. See Cahill v. Mayflower Bus Lines, Inc., 77 F.2d 838, 840 (2 Cir.), cert. denied, 296 U.S. 629, 56 S.Ct. 156, 80 L.Ed. 447 (1935). Inasmuch as the defendants do not claim, and have not shown, that they suffered substantial prejudice from the substitution of judges this claim is without merit.

The convictions are affirmed.

10. The Government suggests that under the circumstances of this case the defendants, as a practical matter, have waived their sixth amendment right because their attorneys consented to the substitution and when, in open court, Judge Bauman explained that he was being substituted for Judge Gagliardi, they did not object, although they could easily have done so.