**UNITED STATES of America,**
**Appellee,**

**v.**

**James BIVONA, Defendant-Appellant.**

**No. 304, Docket 73-1200.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 18, 1973.

Decided Nov. 1, 1973.

Phylis Skloot Bamberger, New York City (Robert Kasanof, The Legal Aid Society, New York City, on the brief), for defendant-appellant.

John D. Gordan III, Asst. U. S. Atty., for the S. D. New York (Paul J. Curran, U. S. Atty., for the S. D. New York, Ira Lee Sorkin, Asst. U. S. Atty. for the S. D. New York, on the brief), for appellee.

Before KAUFMAN, Chief Judge, and LUMBARD and TIMBERS, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

 Once again, we are called upon to consider a criminal appeal in which the sole issue is whether the prosecutor's courtroom conduct was so inflammatory that it deprived the defendant of a fair trial. *See* United States v. White, 486 F.2d 204 (2d Cir. 1973). James Bivona's trial before Judge Motley and a jury consumed only three days and resulted in his conviction for sale of cocaine and for conspiracy. 26 U.S.C. §§ 4705(a), 7237(b).[1] He was sentenced to five years imprisonment on each of two counts, to run concurrently. Although we are compelled anew to reprimand a prosecutor for his remarks, we follow the principle that the bounds of permissible advocacy are to be "drawn within

the concrete terrain of specific cases." United States v. White, *supra,* at 207. Accordingly, we have come to the conclusion that in the context of this trial the comments did not substantially prejudice the appellant.

I.

The factual setting of the case will provide a useful background for examining the prosecutor's comments. Government witnesses established that in early January 1971, George Lawson, an undercover officer with the New York State Joint Task Force, was introduced by an unnamed informant to Jerry Johnson and Judy Niemeyer. Johnson and Niemeyer were named in the indictment along with Bivona, but their trials were severed when they agreed to testify for the government.[2] During Lawson's frequent visits to the couple's apartment at 126 East 4th Street in New York City, he often directed the conversation to the use of narcotics. On January 12, 1971, Lawson moved beyond mere discussion by asking Johnson and Niemeyer if they could supply some cocaine. They agreed to arrange a sale of one ounce for $1,100. That evening, Johnson visited Bivona's photography studio at 99 East 4th Street and asked him to supply the cocaine. Bivona was too tired to discuss the sale that night, but when Johnson returned to the studio the following day Bivona agreed to furnish the drugs. At approximately noon on January 14, Johnson contacted Bivona to confirm the sale and to tell him the purchaser would arrive at Niemeyer's apartment between 5 and 6 p.m. Johnson explained that he

---

1. The indictment charged a second substantive count for an alleged sale of cocaine on February 2, 1971. This count was dismissed on the government's motion during the trial. We note that the statutory provisions charged in the indictment were repealed by § 1101(b)(3)(A) and (b)(4)(A) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1292. The effective date of the 1970 Act was May 1, 1971. Since the events alleged here occurred in January 1971, the old statute governs prosecution and sentencing. Bradley v. United

States, 410 U.S. 605, 93 S.Ct. 1151, 35 L. Ed.2d 528 (1973).

2. On January 29, 1973, the original indictment was superseded by an information charging Niemeyer and Johnson with one count each of selling cocaine not in the original stamped package. 26 U.S.C. §§ 4701, 4703, 4704(a), 4771(a), 4237(a). Niemeyer entered a plea of guilty and was sentenced as a Young Adult Offender and placed on probation for two years. Johnson failed to appear in court and is still a fugitive.

would be working at the time of the sale and suggested that Bivona and Niemeyer handle the transaction without him.

At 4:15 p.m. Lawson went to Niemeyer's apartment where she introduced Bivona as her supplier. At Bivona's request, Lawson brandished a roll of bills, whereupon Bivona left the apartment and returned five minutes later with a package containing cocaine.[3] Lawson departed when the sale was complete, but he continued to discuss drug sales with the couple until February 8, when he arrested Niemeyer, Johnson, and Bivona.

## II.

We have noted earlier that Bivona's only claim on appeal is that the prosecutor's conduct deprived him of a fair trial. In support of this contention, Bivona attacks several portions of the prosecutor's summation as highly prejudicial. Our careful reading of the record discloses, however, that only two portions of the summation raise substantial questions.

■ Bivona claims that the Assistant United States Attorney gave unsworn testimony to fill gaps in the government's case. In an effort to explain why Bivona had not been arrested immediately after the sale—a question raised by the defense at trial—the prosecutor made the following remarks, the greater portion of which was without support in the record:

> The $1,100 was in their hands; the narcotics had been transferred; serialized dollar bills; they got the case; why not arrest him? For this reason. Narcotics peddlers don't advertise their business; they don't advertise their wares. It is the job of these narcotics agents to find the source of the source of the source. They have got Niemeyer, they move one step up the ladder, they got Jimmy Bivona. They want to find out

Jimmy Bivona's source. And that is why Agent Lawson in the apartment said, "How about an eighth of cocaine?" They want more. They are out to negotiate for more. They want to find out Bivona's source, where he gets his drugs and where his source gets the drugs. You don't stop at one level of the ladder when you are dealing in the narcotics traffic. It is that simple. The fact that they didn't arrest him on the scene is just a smokescreen; it is just placing suspicion in your minds and doubt in your minds where it shouldn't be, because common sense tells us that the Government is not going to settle for one ounce if there are more narcotic transactions to be had on the street.

We agree that these comments were ill-advised, but the resulting prejudice was minimal. Moreover, Judge Motley firmly cautioned the jurors, as she did several times throughout the trial, that they were to be guided only by their own recollections of the testimony.

■ Bivona makes another attack on the prosecutor's summation which is more serious. The contention here is that the Assistant United States Attorney improperly asserted his personal belief in the defendant's guilt by derogating Bivona's testimony while placing the imprimatur of the government on prosecution witnesses:

> The Government submits to you, ladies and gentlemen, that for you to accept Bivona's story—and, mind you, mind you, the defense rests entirely on Bivona's story here—the Government submits that for you to accept Bivona's story, even for him to ask you to accept it is an insult to your intelligence and to your common sense, to believe his version of what happened.
>
> . . . [I]t was easy for him to get up on the stand on direct examination and tell his version, his distorted

---

3. When Bivona left the building he was under surveillance by Michael A. Elliott, a member of the New York State Joint Task Force. Elliott saw Bivona cross the street, but lost sight of him until he returned in a few minutes to 126 East 4th Street.

version of the facts. They were more than distorted. They were falsehoods; they were lies; he didn't tell the truth.

. . . The Government does not ask you to like Niemeyer and the Government does not ask you to like Johnson. The Government does not ask you to like Lawson or Elliott. They are doing their job. But the Government has had to call them because they are the only people who knew about this case, and they testified truthfully. They testified so truthfully that even Johnson admitted that he had taken cocaine at some time.

Within recent weeks we criticized a prosecutor for comments of this character. See United States v. White, supra. Although these remarks were as unwise here as they were in White, we must weigh their impact in the context in which they were uttered. The government urges us, therefore, to examine the defense tactics which it argues prompted the prosecutor's untoward statements. See United States v. Santana, 485 F.2d 365 at 370 (2d Cir. 1973).

Bivona contended at trial that he was unaware that narcotics were being sold at the January 14 meeting and that Niemeyer and Johnson, suspecting Lawson's identity, had manipulated the transaction to make Lawson believe Bivona supplied the drugs. To buttress this claim, the defense launched a frontal attack on the credibility of the accomplice witnesses. On cross-examination, counsel sought to demonstrate Niemeyer's and Johnson's intimate involvement in the drug traffic.[4] For example, the following interchange occurred during Johnson's cross-examination:

Q. How often did he come over to your house?

A. George Lawson?

Q. Yes.

A. He came over quite innumerable times.

Q. And that would always be engaging you in conversation about the purchase of drugs?

A. Yes.

Q. And you had a willing ear for that?

Mr. Sorkin: Objection.

The Court: What is the objection?

Mr. Sorkin: The relevancy of all of this.

The Court: What is the relevance, Mr. Segal, as to whether he had a willing ear?

Mr. Segal: Only that he was a purveyor of drugs, your Honor and, therefore, Lawson found him a fit subject.

Defense counsel insinuated also that Niemeyer and Johnson expected to be rewarded for their testimony. In counsel's words, they wanted to "open up the doors of jail for themselves and push the defendant in." Both witnesses, however, testified they had been promised only that the government would call their cooperation to the judge's attention at the time of sentencing.

In his summation, Bivona's counsel continued his assault on the credibility of Niemeyer and Johnson, labelling them "two Judases," who used Bivona as a "stooge." In addition, he characterized Judy Niemeyer as "amoral" and "a woman who has a child of 11 months, living with this man, as she does, Jerry Johnson." Johnson was described as

a man who got a general discharge—I don't know whether any of you are familiar with general discharges, and I can't go into it—but those of you know from your experience in life what a general discharge is. Use your own judgment. And so what is he doing? He is a man who is a drifter. He is what you call a bundle stiff, a man who drifts from one thing to another. He is a carpenter. Somebody else said he was a cook. He had a different kind of engage-

---

4. Niemeyer admitted on cross-examination that she had sold marijuana and LSD on prior occasions. Johnson stated that he had used cocaine at times.

ment here; he is living with this woman by whom he had this child.

In another instance, counsel departed entirely from the record to comment on the shop in which Niemeyer and Johnson worked at the time of trial:

They call it a pet food shop, and I call it something else, and I don't have to tell you what I call it. It is a nursery, perhaps, for the distribution of hashish, marijuana, and every other drug, LSD, that is bandied about and talked about, and that is the reason you have Lawson there.

In view of this defense barrage, we must accord the prosecutor some range to respond. *See* United States v. Benter, 457 F.2d 1174, 1177 (2d Cir.), cert. denied, 409 U.S. 842, 93 S.Ct. 41, 34 L. Ed.2d 82 (1972). Although latitude cannot be equated with license, we must not be "overly nice . . . in scrutinizing the give-and-take of summation." United States v. Santana, *supra,* 485 F. 2d at 371. Accordingly, when we examine the prosecutor's conduct, as we must, in the context of all that occurred at the trial, we find that reversal is not warranted. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239, 242, 60 S. Ct. 811, 84 L.Ed. 1129 (1940); United States v. White, *supra,* 486 F.2d at 207. Proof of guilt was overwhelming and Judge Motley's careful instructions to the jury on credibility, interest, and accomplice testimony protected the defendant from substantial prejudice. We believe whatever harm occurred was minimal.

Although we conclude that reversal is not required here, we cannot ignore the numerous departures from approved prosecutorial advocacy which have been called to our attention within the last six months.[5] Thus, we have considered whether the dramatic step of upsetting a conviction is the only feasible way to deter future prosecutorial misconduct. We are not unmindful of Judge Frank's admonition:

"The deprecatory words we use in our opinions . . . are purely ceremonial." Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court —recalling the bitter tear shed by the Walrus as he ate the oysters—breeds a deplorably cynical attitude towards the judiciary.

United States v. Antonelli Fireworks Co., 155 F.2d 631, 661 (2d Cir.) (Frank, J., dissenting), cert. denied 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946).

We recognize the profundity of these words and, unless the prosecutor heeds our recent warnings, we may be left with no alternative but to reverse convictions where the argument of the prosecution goes beyond what is permissible and fair. But, we fully expect that our criticism here and in *White* will not fall on deaf ears. Indeed, at oral argument, we were advised by the Chief Appellate Attorney in the United States Attorney's office for the Southern District of New York that he was holding a meeting that very day to discuss our *White* opinion with his staff and to caution against repetition of the statements criticized there. He assured us that judicial admonition, even in the absence of reversal, would discourage and curtail the conduct we censured.

Although it is urged that reversal may have a more powerful impact on the prosecutor than mere reprimand, in a case such as this, where the prejudice to the defendant was negligible and guilt so clear, reversal is simply too drastic a measure. Of course, where a defendant's constitutional rights have been violated by the police or the prosecutor, this sanction must be applied. But, to adopt this approach in response to comments evoked by the dynamics of a trial, which in the context of the whole proceeding fall far short of constitutional infringement, would be sacrificing too much.

5. *See* United States v. White, *supra,* 486 F.2d at 206 n. 4.

We have not hesitated in the past to reverse in the appropriate case. *See* United States v. Drummond, 481 F.2d 62 (2d Cir. 1973). This is simply not that case. Accordingly, we affirm.