**UNITED STATES of America,
Appellee,**

v.

**James M. De ANGELIS, Appellant.
No. 444, Docket 73–2314.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 21, 1973.

Decided Jan. 15, 1974.

Certiorari Denied April 22, 1974.
See 94 S.Ct. 1970.

David A. Depetris, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. New York, and Paul B. Bergman, Asst. U. S. Atty., on the brief), for appellee.

Henry J. Boitel, New York City (Frank Santo, New York City, on the brief), for appellant.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

LUMBARD, Circuit Judge:

James M. De Angelis appeals from a judgment of conviction in the district court for the Eastern District (Judd, J.), entered July 27, 1973, after a jury convicted him on a four count indictment charging possession of cocaine with intent to distribute it and also the subsequent distribution of the same, each on two separate occasions, in violation of 21 USC sec. 841(a)(1) and 18 USC sec. 2. The appellant was sentenced to concurrent terms of imprisonment of five years on each of the four counts, plus a parole term of seven years.

On June 7, 1973, the first day of the trial, a co-defendant, Joseph Matranga, pled guilty to all four counts of the indictment and thereafter testified at trial as a witness for the defense. Matranga was sentenced at the same time as the appellant to concurrent terms of imprisonment of three years on each count, plus a parole term of five years.

In challenging his conviction, the appellant contends: (1) that the government prosecutor made an unwarranted and prejudicial argument to the jury concerning Matranga's credibility; (2) that the trial court abused its discretion by allowing the principal government witness to remain in the courtroom during the trial; (3) that the court also abused its discretion in allowing the government to cross-examine the appellant concerning a prior conviction; (4) that the court's charge to the jury was prejudicial to the appellant; and (5) that it was error for the trial court to have denied the appellant's request for a hearing to inquire into the government's failure to produce a known informant.

We find the appellant's contentions without merit and accordingly affirm the conviction.

I.

The government's case at trial consisted primarily of the testimony of five agents of the Bureau of Narcotics. The agents' testimony was that on two occasions, April 13, 1972, and May 12, 1972, the appellant and Matranga participated in transactions involving the sale of cocaine to Special Agent Jordison, an undercover agent of the Bureau and the government's principal witness at trial.

Jordison testified that on April 12, 1972, he was introduced to Matranga at the latter's apartment in Brooklyn by an informant, Marilyn Masick. Jordison expressed his interest on that occasion in purchasing cocaine. The sale of an ounce of cocaine for the following day was later arranged between Matranga and Jordison by telephone, the price to be $800. The sale was completed the next afternoon, as agreed upon. According to Jordison, the appellant brought the cocaine to Matranga's apartment shortly after Jordison's arrival, transferred it to Matranga, who sold it in turn to Jordison. The appellant left upon the completion of the transaction, remarking that all was "cool" (i. e. no police undercover activity), that the quality of the merchandise was "good", and that he hoped more business could be done with Jordison in the future. The appellant's automobile and his arrival and departure at Matranga's apartment building were observed and photographed by a surveillance team of narcotics agents.

Jordison kept in touch with Matranga over the ensuing weeks, expressing his continued interest in cocaine. The surveillance of Matranga's apartment building was also maintained. On May 10, 1972, the appellant was again observed and photographed entering and leaving the building. He also drove the same car as in April. The same day Jordison arranged with Matranga by telephone a larger purchase of cocaine, tentatively to take place on the 11th.

On the evening of the 11th, the appellant was again observed at Matranga's building, but no photographs were taken since it was after dark. Jordison also went to Matranga's apartment, where Matranga showed him an eighth of a kilogram of cocaine, and gave him a

sample (later tested to be 60.5% pure). The price was to be $2600. Jordison delayed the purchase until the following day, and was told by Matranga that he would be provided an eighth of a kilogram of like quality. Jordison did not encounter the appellant at Matranga's apartment on the 11th.

On May 12th Jordison went again to Matranga's apartment. Once again the appellant brought the cocaine after Jordison's arrival. He transferred it to Matranga, who sold it to Jordison, after which Matranga gave a large although unspecified part of the purchase money to the appellant. Again the appellant's arrival and departure in the same car were observed by the surveillance team. The agents also trailed the appellant after he left and photographed him and the car when he stopped at a car wash. The eighth of a kilogram was later tested to be 47.3% pure.

Matranga was subsequently arrested on November 11, 1972, and the appellant on December 11, 1972. The government's reasons for the delay in the arrests were explained to be the hope to unveil further "connections" through Matranga, who had in the meantime changed apartments. As to the appellant, the agents knew him only as "Jimmy" and it was not until his car was later discovered that he was traced to his mother's home in Brooklyn.

The principal witnesses for the defense were the appellant and Matranga. In regard to the April 13th transaction, they testified that the appellant had come to Matranga's apartment in search of his girlfriend, whom he claimed he often found there. De Angelis denied any use of drugs or any trafficking in them, and specifically denied participation in any sale of cocaine on the 13th. Matranga's testimony supported this, as did that of Zohira Torres, who was one of two women who had been present in Matranga's apartment at the time.

In regard to the May 12th transaction, De Angelis testified that he was not in Brooklyn at the critical time but was on the way to eastern Long Island in the company of two friends, Art Doran and Anthony Palumbo, both of whom also testified in support of this alibi. Matranga also claimed, despite the disparity in purity percentage, that the one-eighth kilogram of cocaine purchased by Jordison on the 12th was the same that he had shown him the previous evening.

Matranga also testified that he had an alternate source of the cocaine sold to Jordison. The source was alleged to be two men, one also named "Jimmy" and the other called "Carlos", with whom he occasionally did business at a bar in Coney Island. Matranga stated that this trafficking on his part was almost entirely to obtain drugs to relieve his sciatic condition.

The appellant also placed in evidence the surveillance photographs which had been taken of him in April and May and which had been turned over to the defense prior to trial. Since no photograph had been taken of the appellant at Matranga's building on May 12th, these photographs presented a scenario consistent with the defense version of the events.

The jury ultimately rejected the defense and found De Angelis guilty on all counts.

## II.

### A—The Prosecutor's Summation concerning the Coercion of Matranga

During the cross-examination of Matranga, the prosecutor established that Matranga had at one point subsequent to his arrest agreed to cooperate with narcotics agents in leading them to further "connections" in the drug trade, but that he had later backed out of the agreement because his source had threatened him and his family. On redirect examination, Matranga said that he had been threatened not by "Jimmy" De Angelis but by his alleged source in Coney Island, the "Jimmy" of "Jimmy" and "Carlos".

In summation, the prosecutor reviewed this evidence as follows:

> And then ladies and gentlemen, Agent Jordison gets a call and Matranga says he can't cooperate because he has been threatened. Now ladies and gentlemen, it is true he was threatened and ladies and gentlemen it is true he was threatened by his source and ladies and gentlemen it is true he was threatened by his source Jimmy, but now he comes in here and testifies that it was a different Jimmy. Ask yourselves why would a man who has plead [sic] guilty to the whole thing, why would he do it? Why? Why would he come in and testify for this man? Ladies and gentlemen he was threatened by this man, James De Angelis. . . . Matranga was threatened, threatened by this man because this man was afraid Matranga would give him up.

Despite the fact that he made no objection to this language, or to the prosecutor's questions on cross-examination,[1] the appellant now claims that these remarks were prejudicial to him in that the prosecutor's credibility was thereby placed in conflict with Matranga's before the jury. In support of this contention, the appellant relies on United States v. Puco, 436 F.2d 761 (2nd Cir., 1971), and United States v. Block, 88 F. 2d 618 (2nd Cir., 1937). We do not find these cases in point.

In both *Puco* and *Block*, through the use of detailed leading questions on cross-examination, the prosecutor was able to place before the jury pretrial incriminating statements of the witness which were not in evidence and which the witness's own testimony on the stand flatly contradicted. Moreover, in each of those cases the witness, unlike Matranga, had denied his complicity in the alleged crime. Also in *Puco* it was to the trial prosecutor that the witness had made the prior inconsistent statement which the prosecutor had then spread before the jury.

 Here Matranga had admitted his guilt. He admitted that he and his family had been threatened. And he admitted that the threat came from his source "Jimmy". The prosecutor's summation did no more than recapitulate the witness's own testimony and argue why it was not to be believed. We do not think that his further urging the jury to draw the inference that the source known as "Jimmy" and the appellant were one and the same was improper. It is the accepted and proper purpose of summation to make such arguments regarding the purpose and credibility of any witness so long as there is sufficient support therefor in the record before the jury. As we find such support here, we conclude that the summation was well within permissible limits.

*B—Presence in the Courtroom of Agent Jordison*

Agent Jordison was the government's first witness. Thereafter he was permitted to remain at the counsel table over defense objection. The grounds for objection were that the defense intended to elicit contradictory testimony from the other agents to follow on the stand (all members of the surveillance team at Matranga's building) and that Agent Jordison's presence would inhibit such testimony. The appellant relies on the general rule of the sequestration of witnesses, and while he concedes that the matter is one of discretion for the trial court, United States v. Pellegrino, 470 F.2d 1205 (2nd Cir., 1972), cert. denied, 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973), he claims there was an abuse of discretion here because of the critical nature of Jordison's testimony.

 In our opinion, there was no abuse of discretion on the part of the trial court. Jordison was the first witness called. There is no showing that

---

1. During the cross-examination of Matranga by the prosecutor, defense counsel did request the court to caution the jury that the questions posed by counsel were not part of the evidence. This request was promptly granted.

his remaining in the courtroom resulted in any prejudice to the appellant. Here there was far less possibility of prejudice than was present in *Pellegrino,* where the agent whose presence was objected to was the last witness for the prosecution. Even so, we held that the court's ruling in *Pellegrino* was not an abuse of discretion. We similarly hold that on the facts of this case there was no abuse of discretion here.

## C—De Angelis's Prior Conviction

Prior to placing De Angelis on the stand, his counsel requested a ruling prohibiting the government from impeaching his credibility by reference to a 1966 New Jersey conviction for transporting and possessing some 2800 cartons of untaxed cigarettes, for which he had been fined $1000. The trial court denied the request. As a consequence the defense was constrained to elicit a summary of the prior conviction from the appellant at the beginning of his testimony. This was further referred to by the prosecution in cross-examination.

The appellant now claims that the court's ruling was an abuse of discretion and prejudicial to him. However, a trial court is required to exclude use of a prior conviction for impeachment only if evidence of such a conviction "negates credibility only slightly but creates a substantial chance of unfair prejudice," United States v. Palumbo, 401 F.2d 270, 273 (2nd Cir., 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed.2d 480 (1969). Otherwise the trial court has wide discretion to permit such impeachment testimony, particularly in instances when a prior conviction has involved a crime relating to honesty or integrity. United States v. DiLorenzo, 429 F.2d 216, 220 (2nd Cir., 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1609, 29 L.Ed. 120 (1971); United States v. Palumbo, *supra*; Gordon v. United States, 127 U.S.App.D.C. 343, 383 F.2d 936 (1967).

Here the appellant's prior conviction was neither remote in time from the present offense nor unrelated to his veracity. See United States v. Puco, 453 F.2d 539 (2nd Cir., 1971). Nor was it so similar to the offense charged that the jury was likely to slip into the belief that the crime alleged was merely a repetition of one previously proven. While some prejudicial effect is bound to result from any testimony regarding a witness's prior conviction, that effect here did not so outweigh the probative value of the testimony as to require its exclusion. The offense was relevant and proper for the jury to consider in evaluating the appellant's credibility. Consequently, to permit the testimony was not an abuse of discretion. United States v. Palumbo, *supra*.

## D—The Trial Court's Charge to the Jury

The appellant contends that the trial court's charge to the jury, through its selection of examples from the testimony to illustrate the nature of the evidence, through some inaccuracies in recapitulation, and through inadvertent bias towards the prosecution, improperly enhanced the government's case. We disagree.

We have reviewed the court's charge "in the context of the whole trial record, particularly the evidence and the arguments of the parties", United States v. Tourine, 428 F.2d 865, 869 (2nd Cir., 1970), and have found it fair and thorough. What factual errors there were were minor and not prejudicial. The only possibly improper comment by the court, that "it would have been a simpler case if the defendant and Mr. Matranga had been arrested immediately after the sale on April 13 or the sale on May 12," which might have seemed to intimate that the court disbelieved the defense version of how these sales were made, was carefully corrected by the court:

Ladies and gentlemen of the jury, there may have been one misleading statement that I made. I said the case would have been simpler if the defendants were arrested immediately after the sales on April 13th or May

12th. I didn't mean I am telling you that there was a sale by this defendant at that time. I was simply pointing out the fact that you have to decide the facts on the evidence before you and you can consider whether the Government was delinquent in not making an arrest at that time or whether there was an excuse for the delay. . . . [My] comments are not intended to indicate any opinion on my part as to guilt or innocence.

We find no prejudicial error in the charge as corrected.

*E—The Missing Informant*

Lastly the appellant contends that the failure of the government to make the informant Marilyn Masick available to the defense was a denial of due process requiring at minimum a hearing below on the reasons for her unavailability.

When first mention of the informant arose during the cross-examination of Agent Jordison, defense counsel advised the court that he could probably produce the informant. At a later point defense counsel asked Jordison if he could "produce Marilyn if directed by the Court," to which Jordison replied, "I am not sure." But no request for such a direction was made to the court at that time. Later still, in a colloquy at the bench, defense counsel stated that he "would ask to have her produced." However, when it was clear that defense counsel had as much information available concerning Miss Masick's whereabouts as did the government, the matter of her production at trial was pursued no further, apart from a request by defense counsel for a general charge to the jury on the unavailability of witnesses, which the court granted.

Thus no formal request for a hearing was made at trial, nor any request for an adjournment to provide time to locate Miss Masick, nor any request for the government's help in tracing her. Nor was any showing made of how her possible testimony would have been useful to the appellant. Furthermore, in spite of the court's suggestion that he do so, appellant's counsel did not call a witness available to him, John Kroll, who the appellant claimed had information regarding Miss Masick's unavailability.

We find there was no denial of due process under these circumstances and that there is no reason to remand the case for a hearing. The informant, contrary to the appellant's claim, was not "an intricate part" of the transactions in question. She was at most a "mere introducer" and never participated in the sales themselves. United States v. Russ, 362 F.2d 843, 845 (2nd Cir.), cert. denied, 385 U.S. 923, 87 S.Ct. 236, 17 L. Ed.2d 146 (1966). As such her production at trial was not required, nor any hearing into her unavailability, unless the appellant could make a showing of prejudice stemming from her absence. And no such showing has been made out here. Indeed, the only indication of the informant's possible testimony, an unsigned statement made to narcotics agents, suggests that her testimony would have corroborated the government's case.

Furthermore, this was not a case of an unknown informant. The defense knew her identity, but made no showing that any effort had been made to locate her. Under these circumstances, there was no error in the trial court's rulings. United States v. Russ, *supra*; United States v. Cooke, 339 F.2d 183 (2nd Cir., 1964); see Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

Affirmed.

MANSFIELD, Circuit Judge (concurring in an Opinion in which Circuit Judges LUMBARD and MULLIGAN concur):

I concur completely in every portion of Judge Lumbard's thorough and carefully considered opinion. I would like to add a few words regarding appellant's attack upon the propriety of the prosecutor's summation.

Recently we have had occasion to take prosecutors to task for improperly asserting their personal knowledge of facts or their personal belief as to the credibility of witnesses. United States v. White, 486 F.2d 204, 205–207 (2d Cir. 1973); United States v. Bivona, 487 F. 2d 443, 445–448 (2d Cir. 1973); United States v. Santana, 485 F.2d 365, 370–371 (2d Cir. 1973); United States v. Drummond, 481 F.2d 62 (2d Cir. 1973); United States v. LaSorsa, 480 F.2d 522, 526 (2d Cir. 1973), cert. denied 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973); United States v. Fernandez, 480 F.2d 726, 741 n.23 (2d Cir. 1973); United States v. Miller, 478 F.2d 1315, 1317 (2d Cir. 1973), cert. denied, 414 U.S. 851, 94 S.Ct. 144, 38 L.Ed.2d 100 (1973); United States v. Pfingst, 477 F.2d 177 (2d Cir. 1973), cert. denied, 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973). In at least three of these cases the prosecutor's intemperate remarks were provoked by or responsive to improper statements made by defense counsel in his summation. See *Santana, LaSorsa* and *Bivona, supra*. Yet aside from deploring such defense tactics, we have had little or nothing to say on the subject. I think that it is high time that steps be taken to insure that defense counsel will observe their duties under the ABA Code of Professional Responsibility (1971), DR 7–106(C)(3), (4),[1] and refrain from conduct that not only tends to goad the prosecutor into possible improprieties but to undermine respect for the administration of justice.

In the present case the prosecutor's summation was clearly within permissible bounds. However, when we look back to the defense counsel's summation which immediately preceded it we find that appellant's counsel repeatedly voiced his personal knowledge of facts and his personal opinion of the credibility of witnesses, in total disregard of the Code.[2] For instance, referring to an attorney-client conference which he apparently had had with appellant before trial he stated:

> "However, James De Angelis didn't come to me and say 'Let them prove me guilty. I didn't do it.' He said 'No, no. I want to tell the truth. I want to take the stand.'; After I heard the story, I went into the facts of the case. . . . I think James De Angelis was an honest witness. . . ." [420]

He continued with several similar statements, including the following:

> "On cross-examination we found out it was there on the 11th and the camouflage about pharmaceutical—well, it threw me for a loop until I found out it was just that it was 100 percent purity. I thought they were talking about different cocaine. . . . [416]; *I am not even a federal agent and I know all those things. . . .* [418];
>
> \*　\*　\*　\*　\*　\*
>
> "Only the witnesses you heard for the government, as far as this case goes—I am not interested in the surveillance agents. *I have reports. I have a table of reports.* [420]
>
> \*　\*　\*　\*　\*　\*
>
> "After I heard the story I went into the facts of the case and by the way, the only time I knew about this girl Angel was Thursday or Friday because of one of the reports given to me by Mr. De Petris which, by the way, he is required to do and that report gave a description of this girl. It was only in that way that we locat-

---

1. "DR 7–106(C) In appearing in his professional capacity before a tribunal, a lawyer shall not:

　\*　\*　\*　\*　\*

"(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.

"(4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein."

2. Appellant is represented by a different counsel on this appeal.

ed this girl and you heard her testimony. You believe her. [423]

\* \* \* \* \* \*

"Again it is a normal procedure for an undercover agent to wear a kel set [microphone and recorder]. I don't care what the government says, use your common sense—

"The Court: Stick to the evidence, Mr. Light.

"Mr. Light: There was some testimony there was no kel set to record the conversations. . . . You're not a witness to it. So, get a recording of what was said and then try to overcome that when your voice is on it. Well, we have nothing like that on April 13. . . . They want you to believe this and don't forget we had not [sic] burden of proving ourselves innocent and *I think we did a pretty good job*. . . . [428-29]

" . . . Only when I questioned the agent and I was given the report by Mr. DePetris did I found out about May 11 and that is when you found out about May 11. We never knew that the eighth of a kilo was there on May 11." [430] (Emphasis added)

It is ironic that defense counsel, upon such a record, should have the temerity to attack the prosecutor's summation. But more important from the standpoint of administration of justice is the fact that such conduct on the part of defense counsel seems to be tolerated as the accepted norm in the defense of criminal cases.

Recently the Chief Justice of the United States and the Chief Judge of this Court have commented upon the necessity for improving the quality of the trial bar, particularly in the defense of criminal cases. See N.Y. Law Journal, Nov. 27, 1973, p. 1, col. 3 (John F. Sonnett Lecture by Chief Justice Warren E. Burger at Fordham Law School); N.Y. Law Journal, Dec. 7, 1973, p. 5, cols. 1-6 (Address by Chief Judge Irving R. Kaufman at Annual Dinner of N.Y. County Lawyers Assn.). An important starting point is to curb improprieties

on the part of trial counsel of the type revealed here, which seem to be on the increase. This, of course, will require steps to be taken toward more vigorous enforcement of the Code of Professional Responsibility, more active supervision by trial judges and greater education of the trial bar with respect to its ethical responsibilities.