**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Anthony GALLAGHER,
Defendant-Appellant.**

**UNITED STATES of America, Appellee,**

v.

**John J. McCARTHY,
Defendant-Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Allison FREDENBURGH,
Defendant-Appellant.**

**Nos. 76–2665, 77–1034 and 77–1278.**

United States Court of Appeals,
Third Circuit.

Argued Oct. 3, 1977.

Decided May 5, 1978.

Frederic J. Gross, Takoma Park, Md., Charles M. Berk, Glenda Joyce Phinney, Law Student, for defendant-appellant, Anthony Gallagher.

Frederick P. Hafetz, Goldman & Hafetz, New York City, for defendant-appellant, John J. McCarthy.

Zazzali, Zazzali & Whipple, George L. Schneider, Newark, N. J., for defendant-appellant, Allison Fredenburgh.

Jonathan L. Goldstein, U. S. Atty., Katharine J. Sweeney, Asst. U. S. Atty., Newark, N. J., for appellee, U. S.

Before SEITZ, Chief Judge, and BIGGS and HUNTER, Circuit Judges.

OPINION OF THE COURT

BIGGS, Circuit Judge.

## I. INTRODUCTION

The appellants were charged by a grand jury with conspiracy, 18 U.S.C. § 371, and with the substantive crimes of willful misapplication of bank funds, 18 U.S.C. § 656, and making false statements in connection with loans, 18 U.S.C. § 1014.[1] At all times during the criminal activity charged in the indictment Anthony Gallagher was the president of Bar-Mar Warehouse, Inc. (Bar-Mar), located in Bayonne, New Jersey. John McCarthy was a vice-president of Bar-Mar. Allison Fredenburgh was the Branch Manager of the 45th Street branch of the Commercial Trust Company of New Jersey (Bank). The Bank's deposits were insured by the Federal Deposit Insurance Corporation.

The sixteen-count redacted indictment named all three defendants in the conspiracy count (Count I) and in the counts charging violations of § 1014 (Counts XII and XVI). The remaining counts, charging violations of § 656 (Counts II–XI, XIII, XV), named all three defendants, with the exception of Count XIV, which charged Fredenburgh alone with willful misapplication in connection with a loan made in the name of one Anthony Belis. A copy of the redacted indictment is attached to this opinion as an appendix.

The jury found Gallagher guilty of conspiracy (§ 371) and of the substantive crimes alleged, viz., twelve counts of § 656 violations, and two counts of § 1014 viola-

1. The defendants were also charged with aiding and abetting, 18 U.S.C. § 2, but the court refused to instruct the jury on this charge, expressing a fear that the jury would be confused by a charge on aiding and abetting in view of the charge on conspiracy. The district judge in fact charged on conspiracy.

There were 44 counts in the indictment handed down April 12, 1976. By order of the court of October 6, 1976, with the consent of the parties, the number was reduced to 20 counts with some new enumeration. Subsequently, during trial, four more counts were severed on motion of the government, reducing the total number of counts to 16, and all charges of aiding and abetting, 18 U.S.C. § 2, were deleted.

tions. Fredenburgh was found guilty on all counts as alleged, *viz.*, one count of conspiracy (§ 371), thirteen counts of § 656 violations, and two counts of § 1014 violations. McCarthy was found guilty of conspiracy (§ 371) and of one count of a § 656 violation, in connection with a loan made to one Deborah Dominach, but was acquitted on the remaining counts. The three defendants filed timely notices of appeal.

Because the facts elicited at trial are set forth in detail in subsequent portions of this opinion, we need only briefly summarize them here. The Government contends and the evidence shows that in 1973 Gallagher, McCarthy, and Josephine Johnson, an unindicted co-conspirator and Gallagher's mistress, and at one time an employee of Bar-Mar, collaborated with Fredenburgh to generate needed funds for Bar-Mar and/or for Gallagher which Gallagher was unable to obtain because of his and Bar-Mar's poor credit rating. To obtain money, Gallagher secured loans from the Bank in the names of third persons who were either asked by the conspirators to serve as nominal or sham borrowers and agreed to do so, or in whose names loans were granted without their express approval or knowledge.

## II. FACTS. SUFFICIENCY OF THE EVIDENCE

The appellants insist there is insufficient evidence to convict them upon the charges alleged in the indictment. We, therefore, will go into detail to demonstrate what that evidence is.

### A. As to Fredenburgh

The following persons were named in the sixteen counts of the indictment as borrowers who were involved in the scheme to defraud the Bank: Mari Esposito, Rose DeNicola, Victoria Squillante, Joan Ryan, Nicholas Palmisano, Deborah Dominach, Jane Marie Kellner, Gilbert Nonnenbacher, Melody Slivocka, Peter Daly, Anthony Belis, and Robert Brennan. Of these twelve,

four persons, Victoria Squillante, Joan Ryan, Jane Marie Kellner, and Deborah Dominach, agreed to take out loans on Gallagher's behalf, but were assured that Gallagher would be responsible for repayment. Rose DeNicola and Mari Esposito also agreed to take out loans for Gallagher, who would assume the duty of repayment, and signed loan applications at Josephine Johnson's request thinking that they were credit references. Nicholas Palmisano, Melody Slivocka, Peter Daly and Robert Brennan never filled out loan applications or authorized anyone to borrow from the Bank in their names. Nonetheless loans were granted and checks issued in their names. These checks were allegedly initialled by Fredenburgh. Nonnenbacher and Belis initially met with Fredenburgh to take out loans and filled out loan applications. Nonnenbacher told Fredenburgh to hold the application in abeyance so that he could think about it further. Nonetheless a loan was granted in his name without his instructing Fredenburgh to do so. The money was not received by Nonnenbacher. The checks were initialled by Fredenburgh. Belis filled out a loan application in Fredenburgh's presence, but subsequently informed someone in the loan department of the Bank that he had changed his mind and did not need the loan. Nonetheless, the loan was granted but Belis never received the money. One of the three checks issued to him had on it initials the same as those of Fredenburgh. Toward the end of its case the Government called a handwriting expert who testified that he had compared signature endorsements on the backs of the loan checks with handwriting exemplars provided by the named borrowers. In his opinion the checks issued in the names of the following persons were falsely endorsed: Esposito, DeNicola, Squillante, Dominach, Nonnenbacher, Slivocka, Belis, Brennan, and Palmisano. Fredenburgh, as has been said, was a Branch Manager of the Bank. He knowingly violated consumer loan procedures at the Bank in that he approved loans and checks for applicants rejected by the main office without know-

ing them, and granted loans before the main office had acted. He was permitted to make loans up to $10,000 over the rejection of the main office provided he knew the persons. He frequently broke this rule. Note his transactions with Mari Esposito, Victoria Squillante, Joan Ryan, Nicholas Palmisano, Jane Marie Kellner, and others. Borrowers had loans granted in their names without having any contact with Fredenburgh or the Bank, or without even filling out loan applications. We cite as example loans to Robert Brennan, Peter Daly and Melody Slivocka. Those borrowers whom Gallagher sent to the Bank to take out loans with Fredenburgh were not questioned by Fredenburgh respecting their ability to repay, or the terms of the loans, even though they had no previous dealings with Fredenburgh or the Bank. Such persons include Joan Ryan, and Jane Marie Kellner. Many borrowers never received coupon books from the Bank. These included Rose DeNicola, Mari Esposito, and others. Fredenburgh processed two loans, those of Gilbert Nonnenbacher and Anthony Belis, without their authorization and knowledge. Fredenburgh also rewrote the application of Joan Ryan.[2] Nonnenbacher's application was only partially filled out and he told Fredenburgh to hold it in abeyance so that he could think about it further. In respect to Belis, after he filled out a loan application with Fredenburgh, he called the Bank and told someone (unspecified) in the loan department that he did not need the loan. Nonetheless the loans were made and Fredenburgh initialled all three checks for Nonnenbacher and one of the Belis checks for cashing. Vigorelli, a teller, testified that Fredenburgh had her cash checks of two named borrowers, Rose DeNicola and Mari Esposito, who were not even present. Fredenburgh took the money. Witnesses testified to Fredenburgh's frequent contacts in person or by telephone with Gallagher. Josephine Johnson stated that Fre-

denburgh visited Bar-Mar twice a week throughout the year 1973 and came to see Gallagher and McCarthy. Deborah Dominach testified that during the summer of 1973 she received as many as five calls a day from Fredenburgh requesting to speak to Gallagher. Jeanne Murray testified that Fredenburgh was at Bar-Mar ten times during the year 1973 and telephoned very often. Jane Kellner and Jeanne Murray said that when Fredenburgh came to Bar-Mar, he went directly into Gallagher's office. Josephine Johnson testified that Gallagher told her he had selected the Bank because he had a connection there. He stated that Fredenburgh was that connection. Josephine Johnson also heard Gallagher tell McCarthy to bring the loan applications to the Bank and to be sure that Fredenburgh was there. Mari Esposito testified that Josephine Johnson told her not to worry about repaying the loan because Gallagher was in with Fredenburgh at the Bank. Fredenburgh rewrote Joan Ryan's application. After Fredenburgh approved Jane Marie Kellner's check for cashing, he himself took the check to the teller with Kellner, who cashed it, and when Kellner received the proceeds from the teller, he asked Kellner if she knew "to take the money to the warehouse" [Bar-Mar]. She testified that she took the money to Bar-Mar and gave it to either Gallagher or McCarthy. A few weeks after this incident, Gallagher informed Kellner that Fredenburgh was coming to Bar-Mar to see him. When she expressed alarm that Fredenburgh would discover she worked there instead of at Bayonne Leasing as she had falsely stated on her loan application, pursuant to Gallagher's instructions, Gallagher "just laughed, and said 'Don't worry about it.'" Josephine Johnson testified that Gallagher informed her Fredenburgh "was getting a percentage over these applications." Josephine Johnson saw Gallagher hand Fre-

---

**2.** The government made no issue of this despite Fredenburgh's demonstrated connivance in connection with § 1014, but preferred to pro-

ceed as we show under the heading "1014 charges," *infra.*

denburgh a "wide envelope" approximately the length of a letter envelope. What was in the envelope was not disclosed. Defense counsel attempted to show that Fredenburgh had come to Bar-Mar to solicit a charity contribution from Gallagher and that Gallagher handed it to Fredenburgh, but Johnson denied any knowledge of such a transaction. Josephine Johnson heard Fredenburgh complaining to Gallagher that he was on the verge of losing his job and that his wife was upset about it. Gallagher replied to Fredenburgh: "You took the profit from it and you'll have to take the consequences, just as I have." Peter Daly testified that Gallagher told him "we took care of the guy in the bank, I guess." A file cabinet at Bar-Mar contained coupon books from the Bank and folders bearing the names of the twelve sham or fictitious borrowers. Gallagher had a supply of blank loan applications from the Bank and gave some to Josephine Johnson in order that she might solicit loans.

The evidence clearly establishes that Fredenburgh accepted applications in person or from McCarthy and proceeded to process these applications. In fact, Fredenburgh approved the cashing of checks ranging from $300 to $7,500 in amount well knowing that some bore forged endorsements. In at least two instances, Fredenburgh took the money himself. See the DeNicola-and-Esposito-check incidents set out above. Fredenburgh saw that the proceeds of some loans got to Gallagher, as demonstrated by Kellner's testimony that he, Fredenburgh, instructed her to take $3500 in cash back to the "warehouse," i. e., Bar-Mar. The record does not show that McCarthy received any money, but it does demonstrate that he was a full participant in the scheme to defraud the Bank.

### B. As to Gallagher

Gallagher asked Josephine Johnson to procure people to take out loans from the Bank and to tell them that he, Gallagher, would repay the loan. Gallagher gave Jo-sephine Johnson blank loan applications of Commercial Trust. Josephine Johnson testified that Gallagher asked McCarthy to get people to take out loans for Gallagher and to corroborate information should the Bank call to verify the loan applications; also, that Gallagher told McCarthy to take the loan applications to the Bank and to make sure Fredenburgh was there. Rose DeNicola and Mari Esposito testified that Josephine Johnson asked them to take out loans at the Bank for Gallagher because he was in trouble with the Internal Revenue Service. Victoria Squillante and Joan Ryan testified that Josephine Johnson asked them as a favor to Gallagher to take out loans from the Bank for Gallagher. Gallagher himself asked Jane Kellner to take out a loan for him at the Bank. Gilbert Nonnenbacher testified that Gallagher asked him to take out a loan for him, Gallagher, at the Bank, and Nonnenbacher testified that either Gallagher or McCarthy accompanied him to the Bank. All the named borrowers were informed that Gallagher would repay the loans. Certain named borrowers who did make payments on the loans were reimbursed by Gallagher, viz., Victoria Squillante, Joan Ryan and Gilbert Nonnenbacher. Several of the borrowers testified that they were in fact financially unable to repay the loans granted in their names. In fact, Melody Slivocka testified she was financially unable to repay. Although she never filled out a loan application, a loan was granted in her name. She called Gallagher, who told her he would repay. Also, it appears that Robert Brennan was unable to repay the loan granted in his name and without his knowledge. At the time the loan was granted, Brennan was carrying three student loans and making payments on them himself. Deborah Dominach, like Brennan, told McCarthy she would be unable to repay any loan and agreed to take one out only because she was told Gallagher would repay. Several witnesses testified to Fredenburgh's frequent contacts with Gallagher at Bar-Mar, either in person or by telephone. Josephine Johnson testified that

Gallagher told her that Fredenburgh was his connection at the Bank. Mari Esposito testified that Josephine Johnson told her that Gallagher was "in" with Fredenburgh at the Bank.[3] Gallagher directed Joan Ryan to apply for a $5000 loan and to state that the money would be used for redecorating her home, and to list her place of employment as Wayne Trucking rather than Bar-Mar. Gallagher directed her specifically to see Fredenburgh at the Bank. Ryan went to the Bank and filled out a loan application. She delivered this to Fredenburgh, with whom she had had no previous dealings. Fredenburgh asked her no questions respecting her identification or her ability to repay. As we have said earlier, Fredenburgh rewrote the application after examining it. As we have stated *supra*, he was not charged with this act as a crime. See our comments respecting Counts XII

and XVI, setting up the § 1014 charges, hereinafter. Fredenburgh took the rewritten application and returned with a check for only $3500 which Ryan testified that she brought back to Gallagher. Gallagher directed Jane M. Kellner to see Fredenburgh, *second desk on the right at the Bank, and* to ask for $3500. She had had no previous dealings with Fredenburgh or the Bank. When she arrived at the Bank, Fredenburgh was busy with a customer and when he was free he motioned her over, saying something to the effect that he thought she was there to see him. Fredenburgh did not ask for any identification and did not discuss her ability to repay the loan or how payments would be handled. Kellner filled out part of a loan application; other parts were filled in but not by her. Certain information filled in by her at Gallagher's request, for example, that she worked for a

3. Mari Esposito testified as follows:

"Q. Is this the document [note marked Exhibit "2A"] that Josephine Johnson asked you to sign?
A. Yes, sir.
Q. Now, at the time—did you sign this document?
A. Yes, sir, I did.
Q. At the time that you signed this document, 2A, what did you think you were signing?
A. I thought it was a character witness reference.
The Court: A what?
The Witness: A character witness reference.
Q. What made you think that?
A. She must have told me.
Q. Do you recall her saying that or is it something that you just concluded in your own mind?
A. No, she must have told me.
Q. Do you recall where you signed this document in Mrs. DeNicola's house?
A. Yes, sir, in the kitchen.
Q. At the time you signed this document, 2A, what did Josephine Johnson tell you with regard to a loan?
A. She didn't tell me it was a loan when I signed it. She just said that her boss was in trouble with the income tax.
Q. Did there come a time when you found out that you had signed a loan application?
A. Yes, the next day.
Q. How did you find that out?
A. I guess my sister was the one that told me.

Q. What did you do when you found out you had signed a loan application?
A. I went down and asked Josephine if I had signed a loan application.
Q. What did she say to you?
A. She told me yes. So I told her, I said, "Josephine, what are you crazy? I could never get a loan. I have no credit rating." She said, "Don't worry about it," she said, "Mr. Gallagher is in with somebody in the bank and everything will be taken care of in five or six months. Nobody will get hurt."

\* \* \* \* \* \*

Mr. Williamson [counsel for Gallagher]: I respectfully object to that line of questioning. He should ask a question the answer to which we can make an appropriate objection to. She gave a long strung out narrative that is highly objectionable.
The Court: "What did he say to you" calls for everything. I'll let it stand. The jury will be instructed on that.
Q. When Josephine said that Mr. Gallagher, in your words, "had someone at the bank"—
A. She told me not to worry about it because I told her I had no credit rating. I didn't think I could get the loan. She said don't worry about it, Mr. Gallagher has somebody in the bank and everything will be taken care of in five or six months. Nobody will get hurt.
Q. Did she tell you who that person was at the bank?
A. Yes, she said Mr. Fredenburgh." (T. 1260–1263).

company other than Bar-Mar, was false. About five minutes after she completed the application Fredenburgh gave her a check for $3500 which she endorsed. Fredenburgh took the check to a teller, who cashed it, and Fredenburgh asked her if she knew she was to take the money to the warehouse, i. e., Bar-Mar. She brought the money to Bar-Mar and gave it to either Gallagher or McCarthy. Josephine Johnson testified that Gallagher told her that Fredenburgh was getting a percentage over the applications. Josephine Johnson testified that she saw Gallagher hand Fredenburgh a "wide envelope". Josephine Johnson testified she heard Gallagher tell Fredenburgh "You took the profit from it and you'll have to take the consequences, just as I have." Another borrower, Peter Daly, testified that Gallagher told him that he, Gallagher, took care of the "guy" at the Bank. Several witnesses testified as to the presence at Bar-Mar of a file cabinet containing loan coupon books and files bearing the names of the twelve named debtors, *supra*. Nicholas Palmisano testified that he confronted Gallagher concerning missing personal and business papers which he had discovered on Gallagher's desk and which presumably were used to falsify the loan application submitted in his name and without his authorization. Gallagher told him not to worry about it. Melody Slivocka, one of the borrowers, testified that when she herself asked Gallagher for a $2000 loan, he proposed that she take out a loan for more than $2000 and give him the excess. She refused and at no time filled out a loan application or agreed with Gallagher to take out a loan from any bank. Nevertheless, she subsequently discovered that a $3500 loan had been granted in her name by the Bank. Robert Brennan, one of the borrowers, was a part-time employee at Bar-Mar whose mother had been employed by Gallagher over many years. In 1976 he learned that a $5000 loan had been granted in his name by the Bank even though he himself had never applied for a loan or authorized anyone to borrow in his name. He was completely unaware that a loan was granted in his name until so informed by an Assistant United States Attorney investigating this case. The record shows that Fredenburgh approved this check for cashing. See what is stated below under the headings relating to the § 1014 charge against Fredenburgh.

## C. As to McCarthy

Josephine Johnson testified that in her presence Gallagher asked McCarthy to solicit people to take out loans for him and to corroborate information supplied by the sham borrowers if the Bank called to verify loan applications. Josephine Johnson heard Gallagher ask McCarthy to take loan applications to Fredenburgh at the Bank. Josephine Johnson stated that Fredenburgh visited Bar-Mar to see McCarthy as well as Gallagher. Joan Ryan testified that at least once a day McCarthy would go into a drawer of a filing cabinet in her Bar-Mar office which contained coupon books from the Bank and folders bearing the names of the various sham borrowers. Deborah Dominach also saw McCarthy go into that drawer on more than one occasion. According to Nicholas Palmisano, McCarthy asked him to sign a loan application, which he refused to do. A loan was nevertheless taken out in his name. McCarthy was present both when Gallagher told Palmisano he would repay the loan and when Palmisano confronted Gallagher concerning some missing personal and business papers which he had discovered on Gallagher's desk and which were presumably used to falsify the loan application. Jane Marie Kellner testified that McCarthy solicited her help in procuring a loan for Gallagher, and when she brought the loan proceeds to Bar-Mar pursuant to Fredenburgh's directions, she may have given the money to McCarthy. Gilbert Nonnenbacher stated that McCarthy may have accompanied him to the Bank to arrange a loan for Gallagher and that McCarthy may have given him a coupon book at Bar-Mar. According to Peter Daly, McCarthy was present when he

himself asked Gallagher for a loan and when he signed what he thought were a promissory note and a check for the amount of the loan; in fact, he had signed papers in connection with a $5000 loan in his name from the Bank. Daly testified that McCarthy may also have been present when Gallagher told him that he had taken "care of the guy in the bank." Deborah Dominach, who was employed as a secretary at Bar-Mar in 1973, testified that in June of that year McCarthy told her that Gallagher wanted her, as a favor, to take out a loan for Gallagher at the Bank because he needed the money. She told McCarthy that she would not be able to handle a loan on her own and wanted to think about it. The next day she informed McCarthy that she would do it, but would not be able to repay the loan. McCarthy told her not to worry since the payments would be taken care of by Gallagher. On that basis only, Dominach agreed. Gallagher also told her she would not have to repay. McCarthy told her to go to the Bank and see Mrs. Brockman there. Other testimony indicated that at the time of this transaction Fredenburgh was on vacation. He subsequently signed a loan approval statement. Dominach did so that same morning and told Brockman that Gallagher and McCarthy had sent her. Even though Dominach failed to state that she had come for a loan, Brockman immediately proceeded with the loan application forms. Dominach testified that McCarthy had suggested she fill in "furniture and vacation" as the purpose of the loan, and that when, at the Bank, she told Brockman that she didn't know what purpose to put down on the application, Brockman mentioned furniture and vacation. Brockman did not discuss with her the interest on the loan or her ability to repay it. Dominach never received the $5000 check made out in her name, and when she later questioned Gallagher about it, he told her not to worry. Her name on the check was incorrectly spelled. She was never notified that a loan had been granted, never received a coupon book, and never made any payments. When she received a statement of the amount of the loan and an insurance statement from the Bank, she turned it over to Gallagher.

The appellants' defensive position seems to be based in part on *United States v. Cades*, 495 F.2d 1166, 1168 (3d Cir. 1974). In *Cades*, this court characterized the intent to injure or defraud to be an element "critical" in sustaining a charge of aiding and abetting, that banker Cades' violation of § 656 had the intent to defraud the City Bank and that check-kiter Bloom was aware of Cades' intent to defraud City Bank. It was stated, at 1168: "Certainly, Bloom intended to defraud City Bank by his own actions. That intent might, assuming other elements of the crime are proven, suffice to convict Bloom of a substantive crime such as 'mail fraud'." (Note omitted). We went on to say: "We assume in analyzing the sufficiency of the evidence that the government may meet its burden by showing (1) Cades' intent to defraud City Bank, (2) Bloom's awareness of it, and (3) subsequent actions by Bloom facilitating such fraud; from this evidence, we presume that the jury could reasonably infer Bloom's intent to aid and abet Cades' violation of § 656. After carefully searching the record, we are unable to find such evidence."

■ It cannot reasonably be asserted under the circumstances at bar that *Cades* is applicable; for without employing inference or inferences, the jury could reasonably find as it did that there was a clear intention and effectuation of purpose by the appellants to violate §§ 656 and 371.[4, 5]

4. 18 U.S.C. § 371—"*Conspiracy to commit offense or to defraud United States*—If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"If, however, the offense, the commission of which is the object of the conspiracy, is a

## III. ERRORS AND ALLEGED ERRORS IN THE CONDUCT OF THE TRIAL (UP TO THE CHARGES)

### Alleged Bias of Trial Judge

 Gallagher, and indeed the other appellants, allege that the trial judge was unfair and biased and did not conduct the trial in a fair or judicious manner; in fact, that the trial judge's conduct of the trial was biased as to them. Trial counsel for Gallagher[6] opened to the jury with the following statement:

"MR. WILLIAMSON [Gallagher's trial counsel]: . . . [W]hen a defendant walks into a courtroom the cards are basically stacked up against him. He doesn't have the budget of the federal government.

MR. SUMINSKI [Assistant United States Attorney]: Your Honor, I object.

THE COURT: Mr. Williamson, this is quite improper. It's not opening. And it's not true either.

MR. WILLIAMSON: What isn't true?

THE COURT: Your statement is completely untrue.

MR. WILLIAMSON: What did I say that's untrue to this jury?

THE COURT: I have just ruled. Go ahead and continue with a proper opening Mr. Williamson.

MR. WILLIAMSON: There is nothing that I said to this jury that is untrue, and I take exception to what you say.

THE COURT: Please continue your opening, Mr. Williamson. Maybe your point of view, but it's not true at all and you're not going to be able to put any evidence in about it.

MR. WILLIAMSON: I object to your use of the words true. I seriously object." (T. 3173).

Counsel for Gallagher's statement that the "cards are basically stacked against" a defendant who comes into a federal courtroom is an untruthful statement, and one intended to bias the jury in favor of the defendant. What counsel asserted was in substance that a defendant could not get a fair trial because "the cards are stacked against him." The meaning of the phrase, "stacked cards" or "stack deck" is one which we believe is known to every experienced person and Gallagher's defense counsel, Mr. Williamson, certainly cannot be deemed inexperienced.[7] The insult to the

---

misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

18 U.S.C. § 656, provides in pertinent part: "Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

**5.** Proof of loss is not necessary to sustain the appellants' convictions under § 656. We point out, however, that the twelve debtors caused actual losses to the Bank, as follows: Mari Esposito ($3,363.19); Rose DeNicola ($3,363.19); Victoria Squillante ($2,169.94); Joan Ryan ($1,860.06); Nicholas Palmisano ($7,234.78); Deborah Dominach ($2,586.75); Jane Marie Kellner ($2,929.96); Gilbert Nonnenbacher ($2,123.50); Melody Slivocka ($1,952.11); Anthony Belis ($2,050.88); Robert Brennan ($3,398.00); and Peter Daly ($2,968.23).

**6.** Gallagher's counsel on this appeal is a different attorney than Gallagher's trial counsel.

**7.** The phrase "stack deck" is described in Webster's New International Dictionary, Second Edition, as follows: "Stack cards. *Card playing.* To arrange cards secretly for cheating; hence, *slang,* to have the odds fixed in advance."

court given in the presence of the jury required a rebuke by the trial judge in the presence of the jury. That rebuke was not too severe under the circumstances. Mr. Williamson's characterization of the proceedings in a United States District Court cannot be condoned. The characterization in fact impugned the trial process. *See Arizona v. Washington*, 434 U.S. 497, ——, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).[8]

We state further that incorrect rulings do not prove that a judge is biased or prejudiced although errors may require a new trial. We find no bias or prejudice on the part of the learned district judge. We shall discuss certain of his rulings as we deem necessary and appropriate hereinafter.

### Failure to Follow Jencks Act Procedures

■ Gallagher objects to the trial court's conduct during the hearings held pursuant to *Goldberg v. United States*, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976). Relying upon *Campbell v. United States*, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961), he argues that it was error for the judge to show the witnesses notes taken by government attorneys or agents during witness interviews before questioning the witnesses to determine whether the notes were "statements" under the Jencks Act, 18 U.S.C. § 3500. The trial judge should have followed precisely the procedures required by the Jencks Act and the authorities thereunder, but he did not do so. On the basis of the present record, however, we cannot conclude that the trial judge's conduct or his determination that no Jencks Act material was involved constituted reversible error. We stress, in any event, that Gallagher, in his brief, has virtually abandoned his contentions by characterizing the allegedly improper procedures as in themselves "incon-

In "A Dictionary of Slang and Unconventional English" by Partridge, Third Edition, Revised and Enlarged, Macmillan Company, 1950, the word "stack" is described as follows: "To shuffle (a pack of cards) in a dishonest manner; C. 20: coll., by 1930, S.E. ex U.S. (late C. 19).—2. Hence, to take an unfair advantage: from ca. 1905; coll. by 1933, S.E."

sequential." The other appellants-defendants do not appear to disagree with Gallagher's characterization.

### Comment on Fifth Amendment Advice

■ At one point in the trial, Josephine Johnson testified that Gallagher told her to plead the Fifth Amendment before a grand jury. The evidence was admitted over objection as pertinent to the issue of "consciousness of guilt." In support of Gallagher's position his counsel cites *United States v. Slawik*, 548 F.2d 75, 82 (3d Cir. 1977), and *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). See also *Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975). In *Slawik*, the defendant was accused of violating 18 U.S.C. § 1623, which prohibits making false statements before a grand jury. One of the asserted alleged false statements concerned whether the defendant had advised another person, who was given immunity by the government, to plead the Fifth Amendment before the grand jury. It is difficult to perceive how this evidence could cause any prejudice to Gallagher in light of all the other evidence. At best, he would be prejudiced only to a very slight degree. We point out that Gallagher's Fifth Amendment right not to testify was not involved; only that of an unindicted co-conspirator. The issue, therefore, comes down simply to a ruling on evidence. The standard, of course, is the abuse of discretion. It is necessary to weigh the prejudice of the evidence against the probative value. We conclude that allowing testimony to show consciousness of guilt is very close to the limit of the judge's discretion, but we think there was no abuse by the trial court. It made no comment. Fifth Amendment advice is routinely given

8. When a district judge believes that a violation of the Code of Professional Responsibility may have occurred, he should, at a proper time, bring such matter to the attention of the appropriate disciplinary body. See note 10, *infra*.

and is "neutral conduct." We cannot deem that the facts presented arise to the dignity of a constitutional issue and the matter seems largely to rest in the discretion of the court. We can perceive no abuse of discretion.

### Questioning of Witness In Camera

█ Following the close of the *in camera* hearing on the Jencks Act, 18 U.S.C. § 3500(c), material allegedly pertinent to the testimony of Mari Esposito, there was a remark about Esposito's arrest and the suggestion by Josephine Johnson that she take the Fifth Amendment. The trial judge cleared the courtroom of everyone, including attorneys, and explored this issue. He then made a statement about what he had discovered, saying in substance the matter was of no consequence. What was said was enclosed in a sealed envelope and was not examined by counsel or the jurors. What the trial judge did was to conduct the *in camera* proceeding authorized by 18 U.S.C. § 3500(c) respecting Jencks Act material. There was no suggestion that the Jencks Act was unconstitutional; therefore, there could be no constitutional violation.

An examination of the contents of the transcript in the sealed envelope adds little of value in the controversy. Counsel for Gallagher still insists that he should have the right of cross-examination. However, the sealed portion of the transcript, suggesting the possibility that Mari Esposito had perhaps committed a minor crime, has little bearing upon the present case.

### Josephine Johnson's Immunity

█ The government's principal witness, Josephine Johnson, was characterized by the appellants as an obviously untruthful witness who allegedly was treated too favorably by the judge. Gallagher asserts that Josephine Johnson testified under a grant of immunity and alleges that the immunity "granted" Josephine Johnson was obtained in an "apparent violation of 18 U.S.C. § 6002," as follows: "Whenever a witness refuses . . . to testify . . . the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination . . . ." Josephine Johnson did testify under a proper order granting her immunity. The following appears from the minutes of the United States District Court for the District of New Jersey: "Hearing on Government's application to grant immunity to Josephine Johnson. Josephine Johnson sworn. Order [by the trial judge]— Government's application granted. Dated: September 29, 1976." Her testimony was vehemently attacked by McCarthy's attorney, who questioned her as follows:

"Q. . . . [I]t was only after then that you received a deal to receive immunity that you agreed to testify in this court, is that correct? You got a deal, didn't you, Mrs. Johnson? Do you understand that?

"A. Yes. I'm thinking about your question, sir. Yes.

"Q. You know, do you not, Mrs. Johnson, that you are now off the hook, is that correct?

"A. No. Yes.

"Q. No, yes, which is it, Mrs. Johnson?

"A. Both.

"Q. You know you are not going to be prosecuted, is that correct in regard to this matter?

"The Court: I don't think that is correct, Mr. Hafetz. Her testimony cannot be used against her."

(T. 300–301)

But in the light of the entire record we cannot perceive any substantial basis for prejudice to any of the appellants in Ms. Johnson's testimony. Her veracity was an issue for the jury. See generally the Federal Rules of Evidence, Article V. Privileges, Rule 501, General Rule. We cannot perceive any advantage to appellants in raising a question in respect to her immunity.

### Vouching for the Government's Witnesses by the Prosecuting Attorney

 Mr. Suminski, the prosecuting attorney, made numerous statements in which he vouched for the veracity of the government's witnesses. At the beginning of the trial Mr. Suminski stated that the testimony to be given would come from the mouths of "truthful, creditable" witnesses. In particular, Mr. Suminski asserted that all Josephine Johnson "could testify to is the truth." Mr. Suminski asked a rhetorical question in respect to Ms. Johnson, "What motive did she have to lie against [Fredenburgh]? There is none, because she was telling the truth." Mr. Suminski, in his closing argument, unconditionally asserted his own belief in the defendants' guilt, without reference to the evidence. He stated *inter alia* : (a) "Again, all the defendants are guilty, all are partners in crime, this is an act in furtherance of the conspiracy.", (b) "They are all guilty.", again (c) "They are all guilty.", (d) "All three partners are guilty.", (e) "All three defendants are guilty." Mr. Suminski also stated: (f) "They are all guilty of the misapplication and they are all guilty of the filing of the false statement as part of the conspiracy." Counsel for Gallagher objected and the court said merely, "Objection noted." When Mr. Williamson objected again, the court also simply noted his objection. Again and again there were objections, but each time the court simply said, "Objection noted."

These statements made by the government's counsel respecting his view of the guilt of the appellants were improper, but we cannot deem them to be a basis for a new trial under the present state of the law of this circuit. Formerly, the state of the law was otherwise. In *United States v. Schartner*, 426 F.2d 470 (3d Cir. 1970), we said: "There remains for our consideration the Government attorney's remarks that 'I have a duty to protect the innocent and to see that the guilty do not escape. *I say to you with all sincerity I can muster that if you do not convict the defendant the guilty will escape.*' (Emphasis added.) In respect to this remark Schartner's counsel not only objected but also requested the withdrawal of a juror. We cannot countenance these remarks. Not only do they imply a personal belief in Schartner's guilt, but they also directly invite the jury to rely on the Government attorney's experience in prosecuting criminals generally and on the Government attorney's 'sincerity'. Neither the prosecutor's general experience nor his moral integrity has anything to do with the evidence in the case. In these respects these statements differ from and are more prejudicial than the unadorned statement of belief which we grudgingly approved in *Meisch, supra.*[9] We hold that they constitute reversible error. Cf. *United States v. Gambert*, 410 F.2d 383 (4 Cir. 1969)." *Schartner* stated outright that the statement made by the Government's attorney required reversal. That was in 1970, and the law of this circuit has been substantially modified following the *Schartner* decision. Following *Schartner*, in *United States v. LeFevre*, 483 F.2d 477 (3d Cir. 1973), the Court concluded that reversal was not warranted when the prosecutor commented on defendant's credibility since the comments were based on evidence before the court and since, in light of the considerable evidence supporting the conviction, the comment was not unduly prejudicial. Similar reasoning was applied in *United States v. Benson*, 487 F.2d 978 (3d Cir. 1973), where the court concluded that the comment ". . . I know that to do justice you must return a guilty verdict" did not warrant reversal. First, the Court noted that the remarks impliedly included the words "on the evidence" hence reversal per se was not required. Second, in light of

---

9. In *United States v. Meisch*, 370 F.2d 768, 773 (3d Cir. 1966), the prosecutor made the following opening statement: " 'And *I am convinced*, as I am sure you will be when you hear the evidence and see it presented before you, that there will be no question but that defendant * * * * is guilty of the crime charged.' " (Emphasis added.)

the considerable evidence supporting the conviction, the comment was not unduly prejudicial.

*Schartner's* per se rule has indeed been limited considerably. In *United States v. Somers*, 496 F.2d 723 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974), the Court stated at 740:

> "We have since limited *Schartner* to its facts; *Schartner* requires a *per se* reversal only when the prosecutor expresses an opinion on the guilt of a defendant based on evidence not in the record. . . . Although the remark at issue [1] does rep-
>
> [1] "If you're going to put my knowledge of what I know about this case not in evidence, I will speak on my summation what I know more about that is not evidence that will really fill out this whole void." 496 F.2d at 740.
>
> resent a comment on evidence outside of the record, it does not constitute an opinion on the guilt [of the defendant.]"

A recent case on point, *United States v. Homer*, 545 F.2d 864 (3d Cir. 1976), *cert. denied*, 431 U.S. 954, 97 S.Ct. 2673, 53 L.Ed.2d 270 (1977), relies extensively on *Somers, supra*, and affirms defendant's conviction on the theory that the prosecutor's comments were not so gross or inflammatory as to constitute prejudicial error in light of the instructions given by the judge.

Essentially the same line of reasoning applies to opening as well as closing statements. See *United States v. DeRosa*, 548 F.2d 464 (3d Cir. 1977) in which an appellant's conviction was affirmed even where the government read several pages of wiretap transcripts during its opening statement. The prejudice was cured by the trial judge's instruction to ignore, for the purposes of determining guilt or innocence, any statements made during opening by counsel.

The Second Circuit has reached a similar conclusion. In *United States v. White*, 486 F.2d 204 (2d Cir. 1973), *cert. denied*, 415 U.S. 980, 94 S.Ct. 1569, 39 L.Ed.2d 876 (1974), defendant appealed from a conviction based on the prosecutor's statement that defendant was guilty and had lied. The court, noting (with) disapproval, the

statement, nevertheless affirmed the conviction since the defendant was not significantly prejudiced by the comment. In *United States v. Bivona*, 487 F.2d 443 (2d Cir. 1973) the court again affirmed a conviction in light of a clearly inappropriate comment by the prosecutor, concluding that, if the statements continued unabated, it would reverse convictions to deter such misconduct in the future. In contrast, however, in *United States v. Grunberger*, 431 F.2d 1062 (2d Cir. 1970) a case earlier than both *White* and *Bivona*, the Court reversed a conviction where the prosecutor stated "I do not know of a case where the evidence is stronger to establish guilt." Reversal was warranted since the comment reflected the personal experience of the prosecutor which was not in evidence before the Court. Finally, in *United States v. Burse*, 531 F.2d 1151 (2d Cir. 1976), a concluding statement was considered prejudicial in light of the meager evidence supporting the conviction, the factual errors it contained, the derogatory comments concerning witnesses, and the fact that, by stating "we know he's guilty," the prosecutor may have been implying it had evidence not before the court confirming the defendant's guilt.

This case law suggests, therefore, that before reversal is warranted based on the statements alone, those statements must be based on information not before the Court. If the statements are based on evidence, prejudice must be shown to result to the defendant before reversal is warranted. Such prejudice can be cured by an appropriate instruction by the trial judge or by a finding that there is overwhelming evidence to support the conviction.

In the trial the district judge did nothing to stop or correct the improper attitude adopted by the Government's counsel, but in view of the amplitude of the evidence proving the appellants' guilt, we cannot say that the unfortunate statements quoted above alone require reversal. We point out, however, that the ABA Standards, *The Prosecution Function*, § 5.8(b), condemns as "unprofessional conduct" a prosecutor's as-

sertion of his personal belief in "the truth or falsity of any testimony . . . or the guilt of the defendant." The Commentary to that subsection states: "Such expressions by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of his office and undermine the objective detachment which should separate a lawyer from the cause for which he argues. Such argument is expressly forbidden. ABA Code DR7–106(C)–(4); Drinker, Legal Ethics 147 (1953). Many courts have recognized the impropriety of such statements. Annot., 50 A.L.R.2d 766 (1956). This kind of argument is easily avoided by insisting that lawyers restrict themselves to statements which take the form, 'The evidence shows . . .' or some similar form. The experienced American and British advocate will say, for example, 'I leave it to you whether this evidence does not suggest . . .' etc. *Harris v. United States*, [131 U.S.App.D.C. 105] 402 F.2d 656, 657–59, D.C.Cir. (1968)." Under the circumstances at bar and in view of the strong evidence of guilt, we cannot treat the conduct of Mr. Suminski, undesirable as it was, as grounds for reversal. We stress, however, that the district court should feel an affirmative obligation to stop or correct such statements as were involved in the present case whether or not there is objection by counsel.[10]

### Conclusions as to Errors at Trial Prior to Charges

The appellants insist that the errors at trial were sufficient to deprive them of due process. We cannot agree. None of the errors, individually or together, constituted denial of due process.

Motions made by the appellants during the course of the trial, except as above noted, need not be set out or detailed here.

### AS TO THE CHARGES [11]

#### Failure of the Court to Pursue the Federal Rules of Criminal Procedure Prior to Charge by Court

Respecting the charge, Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C., *Instructions,* provides: "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury."

The attitude of the trial court in respect to the application of Rule 30 is far from clear. Mr. Suminski, counsel for the government, commenced his summing up on page 3449 of the transcript. Prior to that point considerable time was devoted by the court and counsel in discussing charges to be given to the jury, and written requests by all the parties were received by the court. The learned trial judge stated, however, that he *"never"* gave instructions in the exact language proposed by counsel, and a close examination of his charges shows his statement was correct. It is difficult for a skillful lawyer to intelligently argue his case to the jury without knowing to some degree at least what the court's instructions will be. The judge substantial-

---

10. See note 8, *supra*. What has there been stated is also applicable here.

11. There were in fact three requests by the jury. A second charge was delivered as is set out *infra* in this opinion. The other two requests by the jury need not be considered here.

ly abandoned the concept of Rule 30 F.R. C.P., and counsel were, therefore, burdened in presenting closing arguments.

The effect of Rule 30, which was intended to be of substantial assistance to both counsel and the court, has been somewhat modified by decisions which restrict its application. Such a case is *United States v. Hermosillo-Nanez,* 545 F.2d 1230, 1233 (9th Cir. 1976), *cert. denied,* 429 U.S. 1050, 97 S.Ct. 763, 50 L.Ed.2d 767 (1977), which states categorically: "Failure to comply with Fed.R.Crim.P. 30 is not reversible error unless there is prejudice to the defendant. *Irwin v. United States,* 338 F.2d 770 (9th Cir. 1964), *cert. denied,* 381 U.S. 911, 85 S.Ct. 1530, 14 L.Ed.2d 433 (1965), *Carbo v. United States,* 314 F.2d 718 (9th Cir. 1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964)." Another decision is *United States v. Cardall,* 550 F.2d 604, 607 (10th Cir. 1976), *cert. denied,* 434 U.S. 841, 98 S.Ct. 137, 54 L.Ed.2d 105 (1977), as follows: "We have heretofore held that the failure to rule on requested instructions prior to oral argument is not an 'absolute,' and that prejudice must be shown as to a specific matter, point, or issue before such omission by a trial court will constitute reversible error. *See United States v. Pommerening,* 500 F.2d 92 (10th Cir. 1974), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 678, 42 L.Ed.2d 680 (1974), and *Whitlock v. United States,* 429 F.2d 942 (10th Cir. 1970). In the instant case defense counsel made no objection until *after* closing argument, and on appeal there is no indication as to precisely how there was resulting prejudice stemming from this inadvertent omission by the trial court. The claim of prejudice is made in most general terms. In such circumstance the failure to comply with Rule 30 does not constitute grounds for reversal." It would appear from the foregoing that a valid charge may be framed without strict observance of Rule 30. Under the circumstances at bar the failure to observe the rule cannot be viewed in and of itself as an error of such magnitude as to warrant reversal.

■ None of the foregoing defects in the trial procedures are sufficient to warrant a new trial. If they be added together, their sum is not sufficient to cause us to conclude that the appellants were denied due process of law.

We now will proceed to examine the charges to the jury.

### The Charges to the Jury

■ The crime of willful misapplication of bank funds was created by Congress in 1864, Act of June 3, 1864, § 55, 13 Stat. 116. It is difficult to define the substance of that offense. Willful misapplication we find to be a conversion by a bank employee even though he does not take the money for himself. It is possible that the statutory provision is an attempt to enlarge the common law definition of embezzlement. *See United States v. Britton,* 107 U.S. 655, 667, 2 S.Ct. 512, 27 L.Ed. 520 (1883), and *United States v. Docherty,* 468 F.2d 989 (2d Cir. 1972). In *Docherty,* the Court of Appeals of the Second Circuit, by Judge Friendly, noted various acts which have been held to be illegal under § 656: employee of bank knowingly engaged in check "kiting" scheme (allowing checks from bank B to keep account in Bank A from being overdrawn, while checks from bank A keep the B account from being overdrawn), *see United States v. Mullins,* 355 F.2d 883 (7th Cir.), *cert. denied,* 384 U.S. 942, 86 S.Ct. 1465, 16 L.Ed.2d 540 (1966); bank employee paid money to a customer on what he knew was an overdrawn account, and then concealed the overdraft, *see Logsdon v. United States,* 253 F.2d 12 (6th Cir. 1958); bank officer loaned money without security knowing that the borrower could not repay, *Robinson v. United States,* 30 F.2d 25 (6th Cir. 1929); bank manager intentionally ignored repeated overdrafts, *Benchwick v. United States,* 297 F.2d 330 (9th Cir. 1961); bank officer pocketed proceeds of loan from another bank in the name of his bank, leaving an uncollectible personal note for security, *Hargreaves v. United States,* 75 F.2d 68 (9th Cir.), *cert. denied,* 295 U.S. 759, 55 S.Ct. 920, 79 L.Ed. 1701 (1935); bank officer pocketed the proceeds of a loan he knew was issued on a fraudulent application, *United States v. Fortunato,* 402 F.2d 79 (2d

Cir. 1968), *cert. denied,* 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969). *Docherty* involved a scheme whereby a bank officer who was unable to borrow money from his own bank or from other banks solicited his friends, including Docherty, a lawyer, to apply for loans at his (the officer's) bank and give the proceeds to him. The court held that Docherty could not be held guilty as an accomplice to the bank officer because there was insufficient evidence of Docherty's intent to "injure" the bank: "Docherty knew he was putting his own credit on the line, and it is not suggested that he lacked the means to repay." 468 F.2d at 995.

The most systematic of the recent attempts to define "willful misapplication," 18 U.S.C. § 656, in the context of third party loans is found in *United States v. Gens,* 493 F.2d 216, 221–223 (1st Cir. 1974). In *Gens,* directors and officers of a bank granted loans to named debtors who turned over the proceeds to Gens, one of the directors, for use in Gens' nursing home business. Testimony at trial established that the named debtors understood that they would be personally responsible for repaying the loans in the event that Gens failed to do so, even though they never received the proceeds. Moreover, all were financially capable of repaying the loans for which they signed. In its charge to the jury, the trial court first stated that the government's theory of willful misapplication was as follows: " ' . . . that Defendant Gens dominated and controlled Defendants Porter and Carleton or at least worked in concert with them to arrange loans to the persons named in each count in the indictment, knowing that such person were not the true borrower and that Defendant Gens was to be the true beneficiary thereof, and that each of such persons was used as the borrower either with or without the knowledge and consent of the common borrower in order to disguise the concentration of the bank's funds to Defendant Gens.' " The court of appeals stated that the district court then instructed the jury that it had to find that appellants " 'misapplied or caused to be misapplied money, funds, or credits of

the bank by granting a loan for the amount and to the person named in the particular count so that these funds could be converted to the use of . . . Gens.' " [12] The court of appeals held these instructions erroneous because the jury could have concluded that appellants were guilty if they granted loans to named debtors knowing that the proceeds would be turned over to Gens.

In summarizing the holdings of cases involving bank loans made to named individuals who, with the knowledge of bank officials, passed on the proceeds to third parties, the *Gens* court observed:

> "The cases of this type in which willful misapplication has been found fall into three general categories. First, those in which bank officials knew the named debtor was either fictitious or wholly unaware that his name was being used. . . . Second, cases in which bank officials knew the named debtor was financially incapable of repaying the loan whose proceeds he passed on to the third party. . . . Third, cases in which bank officials assured the named debtor, regardless of his financial capabilities, that they would look for repayment only to the third party who actually received the loan proceeds, in other words where the debtor allowed only his name to be used, enabling the bank officials to grant a de facto loan to a third party to whom the bank was unwilling to grant a formal loan. . . . In the three situations described above, the loans formally being made could be characterized as sham or dummy loans, because there was little likelihood or expectation that the named debtor would repay. The knowing participation of bank officials in such loans could consequently be found to have a 'natural tendency' to injure or defraud their banks and thus constitute willful misapplication within the meaning of § 656. . . .

On the other hand, where the named debtor is both financially capable and fully understands that it is his responsibility to repay, a loan to him cannot—absent

---

**12.** These quotations are from the court of appeals opinion in *Gens* at 221.

other circumstances—properly be characterized as sham or dummy, even if bank officials know he will turn over the proceeds to a third party. Instead, what we really have in such a situation are two loans: one from the bank to the named debtor, the other from the named debtor to the third party. The bank looks to the named debtor for repayment of its loan, while the named debtor looks to the third party for repayment of his loan. If for some reason the third party fails to make repayment to the named debtor, the latter nonetheless recognizes that this failure does not end his own obligation to repay the bank. In this situation, the bank official has simply granted a loan to a financially capable party, which is precisely what a bank official should do. There is no natural tendency to injure or defraud the bank, and the official cannot be said to have willfully misapplied funds in violation of § 656." 493 F.2d at 222 (citations and footnotes omitted).

The trial court's initial instruction on the substantive offense of willful misapplication contained the following language:

"The money or funds of a bank are misapplied when they are taken or appropriated or channeled, that is converted, to the use and benefit of the bank officer or employee or some third party. There is misapplication if the money or funds are diverted to an unauthorized or unjustified or wrongful use.

The law does not treat as a misapplication the making of a bad loan, or a careless or negligent handling of money. It does not treat as a misapplication the making of a loan with poor judgment or anything of that nature.

The evidence must show something more than that, because the law requires that the misapplication be done knowingly and with a specific intent to either injure or defraud a bank.

*In considering each of the loans involved in this case, if the evidence persuades you beyond a reasonable doubt that the bank officer or employee made the loan to an individual as a personal or consumer loan, or as a home improvement loan, and that at the time the loan was made he knew or had reason to know that the real borrower was someone else, and that the real purpose was a business rather than a personal use, then you may find that the loan was a wilful misapplication of bank funds with the intent to either injury [sic] or defraud the bank."* (Emphasis added.).

The appellants contend that the trial court's instructions were erroneous because the court failed to charge the jury that it must find that Fredenburgh knew that those named as debtors lacked the ability or intent to repay the loans.[13] We agree. This error was not corrected and the necessary precatory language was also omitted from the supplemental charge. This vital error was never cured.

Our finding that the instructions concerning § 656 were erroneous necessitates the reversal of Fredenburgh's convictions on substantive § 656 charges. In addition, the conspiracy convictions obtained under Count I of the indictment must be reversed. Count I alleged a conspiracy, § 371, to violate § 656 and § 1014, and the trial judge instructed the jury that a finding that a conspiracy to violate either statute existed would support a conspiracy conviction. The verdict returned on Count I was general and it is unclear upon which ground or grounds the convictions were based. Since the jury was erroneously instructed on the § 656 offenses, and since, under the court's charge, it could have based its verdict solely upon a finding that a conspiracy to violate § 656 existed, Count I must be reversed notwithstanding our conclusion that the § 1014 instructions were not erroneous. *Cf. Stromberg v. California,* 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *United States v. Dansker,* 537 F.2d 40, 51 (3d Cir. 1976), *cert. denied,* 429 U.S.

---

**13.** We note that both the government and the defendants requested the trial judge to include this element in his charge. *See, e.g.,* the government's requested instructions # # 23–

25, McCarthy's request # 2, and Gallagher and Fredenburgh's requests # # 11 and 12. Apparently the learned district judge thought he

1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).[14, 15] Consequently, because of our decision to reverse the § 656 convictions of Fredenburgh, the principal, and because the jury might have based its conspiracy convictions of all three appellants upon an erroneous conception of § 656, the substantive § 656 violations imputed to Gallagher and McCarthy as co-conspirators of Fredenburgh must also be reversed. *See and compare United States v. Schoenhut*, No. 77–1793, 576 F.2d 1010 (3d Cir. 1978).

We will proceed now to a discussion of the § 1014 charges and the convictions thereunder.

## IV. CONVICTIONS UNDER § 1014

References are made to the appendix, to Counts XII and XVI, which charged Gallagher, McCarthy and Fredenburgh with making false statements in connection, respectively, with the fictitious Slivocka loan, Count XII, and with the fictitious Brennan loan, Count XVI.

The last fifteen counts of the redacted indictment incorporate by reference the first charge under Count I, the conspiracy charge, as will be observed from an examination of the appendix. Count XII and Count XVI of the indictment allege that applications for fraudulent loans were submitted to the Bank by the appellants and these contained, respectively, the names of borrowers, Slivocka, Count XII, and Brennan, Count XVI. More simply stated, the government alleges that the appellants submitted loan applications for persons who were not borrowers.

McCarthy was acquitted by the jury of § 1014 charges, and there is insufficient evidence to prove beyond a reasonable doubt that Gallagher is guilty of these charges.[16] We cannot sustain the convic-

had included the requested *"Gens"* language in his charge.

**14.** The *Dansker* court stated: "Before turning to the alleged errors of the trial court, we will first consider the defendants' contention that their convictions under Counts I and II must also be reversed, if, as we have already determined, the evidence under Count III was insufficient to support their convictions for bribing Serota.

"With respect to Count I, the defendants argue that in view of our decision on Count III, it is no longer possible to determine whether they were convicted of a conspiracy properly charged and proven. Count I alleged that the defendants had conspired to bribe Ross and Serota. The district court, however, instructed the jury that if it found that the alleged conspiracy had as its illegal objective *either* the bribe of Ross or Serota it could convict the defendants. The conspiracy count was thus submitted to the jury on alternative theories, only one of which, in retrospect, was sufficient to justify a conviction. The jury then rendered a general verdict of guilty on Count I making it impossible to identify the grounds on which its decision was based. Consequently, the defendants assert that their convictions may have rested solely on a finding that they had conspired to bribe Serota and must, therefore, be reversed.

"In response, the government maintains that any lingering doubts as to the basis of the jury's verdict on Count I are dispelled by its decision on Count II. Since the jury there found the defendants guilty of jointly bribing Mayor Ross, the government insists that it must have also determined that the Ross bribe was at least one of the conspiracy's objectives. The government therefore concludes that the validity of the conspiracy convictions are in no wise jeopardized by our decision with respect to Count III.

"We cannot agree. The government's position ignores the fact that the crime of conspiracy is separate and distinct from the related substantive offense. It requires proof of the additional element of an agreement between the alleged co-conspirators. *Pinkerton v. United States,* 328 U.S. 640, [66 S.Ct. 1180, 90 L.Ed. 1489] (1946); *United States v. Pappas,* 445 F.2d 1194 (3d Cir. 1971). Hence, it is neither illogical nor impossible for a jury to find an alleged conspiracy nonexistent while, at the same time, convicting the defendants of the substantive offenses charged.

"In the instant case, the possibility thus remains, albeit slim, that the jury found that the defendants engaged in a conspiracy to bribe Serota alone in spite of its guilty verdict on Count II. As a result, the defendants' conspiracy convictions must be vacated and this case remanded to the district court for a new trial unless it determines that Count I, in its present form, is fatally defective in light of the conclusions reached herein."

**15.** An examination of the verdict sheets is of no assistance in solving this dilemma.

**16.** 18 U.S.C. § 1014, provides in pertinent part: "Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . .

tion of Gallagher on the § 656 charges by reason of the incorrect charge hereinbefore set out. It must be borne in mind that the court did not charge in respect to aiding and abetting. See *n. 1, supra.*

The evidence has to show, of course, in respect to Fredenburgh that beyond a reasonable doubt he actually participated in steps to deceive the Bank in that he approved applications to the Bank knowing they contained false statements as to the identity of the borrowers. The gist of the crime is proved by the testimony of Frank Cocco. Cocco testified that he was employed by Commercial Trust Company and was vice president in charge of the Consumer Credit Department; that he had known Fredenburgh for ten years as manager of the Bank's 45th Street Branch Office, and that he was in charge of customer loans and a supervisor of Fredenburgh's accounts. He also stated in effect that he had taught Fredenburgh his job. He was shown a number of documents relating to the purported loans to Melody Slivocka and Robert J. Brennan. These included a cashier's check drawn to the order of Slivocka for $3,500 (Government Exhibit 11–B), and in Slivocka's case an application purportedly made by Slivocka for a loan with the initials "Al F." at the bottom of it (Government Exhibit 12), and a "Branch Approval" dated August 8, 1973 signed "Al Fredenburgh, Asst. Treasurer" (Government Exhibit 11–D); in respect to Brennan, a treasurer's check signed on the back "Robert J. Brennan" with the initials "Al F." (Government Exhibit 17–B), and a loan application purportedly signed by Brennan and initialled at the bottom "Al Fredenburgh" (Government Exhibit 18). Mr. Cocco testified in respect to the Slivocka loan. He was shown Exhibit G–11–D, relating to the Slivocka loan, and the following testimony was given:

"Q. I show you 11D. Can you identify that?

any bank the deposits of which are insured by the Federal Deposit Insurance Corporation . . . upon any application . . . or

A. It's an approval statement approving the Melody Slivocka loan for $3,500, and it's signed by Mr. Fredenburgh." (T. 494).

He was also shown Exhibit G–11–B, and he testified as follows:

"Q. Can you identify 11B?

A. Treasurer's check drawn by the 45th Street office in the amount of $3,500 made payable to Melody Slivocka. Cashed July 30th, 1973. Endorsed, Melody Slivocka, and okayed for cashing by Mr. Fredenburgh." (T. *id. supra*).

As to the Brennan loan, he testified in regard to the cashier's check as follows: "This check was made payable to Robert Brennan and cashed September 6, 1973. There is an endorsement on the other side in the name of Robert Brennan, and it was approved to be cashed by Mr. Fredenburgh. His initials appear on the reverse side." (T. 533).

Mr. Cocco was not a handwriting expert nor an expert on questioned documents, but he did not need to be under the Federal Rules of Evidence, Article IX, *Authentication and Identification.* Rule 901, Requirement of Authentication or Identification, provides: "(a) General provision.—The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. . . . (b) . . . (2) Nonexpert opinion on handwriting.—Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation." Mr. Cocco was fully qualified to testify respecting the signatures and initiallings of Fredenburgh. The evidence proves, therefore, that Fredenburgh, by his approvals, caused fraudulent applications for loans to be submitted to the Bank for persons who were not in fact borrowers. With respect to Fredenburgh, it is the law

loan . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both."

that the evidence must be viewed in the light most favorable to the government, *United States v. Allard,* 240 F.2d 840 (3d Cir.), *cert. denied,* 353 U.S. 939, 77 S.Ct. 814, 1 L.Ed.2d 761 (1957). Both Slivocka and Brennan testified that they had no knowledge of their "so-called loans." It follows that the convictions of Fredenburgh on Count XII and Count XVI must be affirmed.

The charge to the jury in respect to § 1014 was adequate.

Other points raised by the parties do not require discussion.

## V. CONCLUSION

█ We will vacate all judgments of conviction save those against Fredenburgh based on § 1014. As to Fredenburgh, we will vacate all judgments of sentence.[17]

The case will be remanded.

17. By order of the district court of January 21, 1977, Fredenburgh was sentenced as follows (the numbering of the counts is that of the original indictment):

"A. For a period of 5 years on each of Counts 1, 22, 24, 18 and 4, said terms of imprisonment to be concurrent with each other;

B. For a period of 5 years on each of Counts 30, 14, 38 and 12, and 2 years on Count 41 said terms of imprisonment to be concurrent with each other and consecutive to the sentence under A;

C. For a period of 5 years on each of Counts 13, 27, 16, 36 and 35, and 2 years on Count 43, said terms of imprisonment to be concurrent with each other and consecutive to the sentences under A and B.

"Execution of sentences under C and B is hereby suspended, and defendant is placed on probation for a period of 5 years to follow release from supervision under A.

"Special condition of probation: defendant is to make restitution on a 'best efforts' basis up to a maximum of $34,495.14 to those persons suffering loss."

Counts 41 and 43 referred to in the above Order are Counts 12 and 16, respectively, of the redacted indictment, charging violations of 18 U.S.C. § 1014. The judgments of sentence imposed on the § 1014 convictions must be vacat-

ed and the cause remanded for resentencing on those counts because Fredenburgh was also found guilty and sentenced on the conspiracy count and the § 656 counts, a fact which must have been taken into consideration by the trial judge in sentencing on the § 1014 counts.

In *United States v. West,* 511 F.2d 1083, 1087 (3d Cir. 1975), in a somewhat similar situation, after holding that the conviction of West on Counts 1 and 2 could not stand, it was stated: "However, count 3 [on which West was also convicted] presents different considerations. West does not contend that Chieves supplied him with the two bundles of heroin found in his car. Rather, he testified that he did not know how it got there. Laguins testified that a few minutes before West's arrest and the discovery of this heroin in his possession, West had stated in a telephone conversation that he was en route to deliver two bundles to Laguins. Thus, the defense that must prevail on counts 1 and 2 is not supported by the evidence on count 3. However, West was sentenced generally to five years imprisonment on all three counts. It may well be that if the court had considered only the third count and the evidence relevant to the events of January 29, as now it must, a less severe sentence would have been imposed. Therefore, there must be a resentencing on count 3."

## APPENDIX

## UNITED STATES DISTRICT COURT

District of New Jersey

Criminal No. 76–144

Title 18, United States Code, Sections 371, 656, and 1014.

UNITED STATES OF AMERICA

*v.*

ANTHONY GALLAGHER, JOHN McCARTHY, and ALLISON FREDENBURGH

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges that:

## COUNT I

1. At all times mentioned in this indictment the Commercial Trust Company of New Jersey ("Commercial Trust") a bank incorporated under the laws of the State of New Jersey with its principal office located in Jersey City, New Jersey, whose deposits were insured by the Federal Deposit Insurance Corporation, maintained a branch office located at 45th Street and Broadway, Bayonne, New Jersey.

2. From on or about July 12, 1955, to on or about November 12, 1969, the defendant Allison Fredenburgh was an employee of Commercial Trust. On or about November 12, 1969, the defendant Allison Fredenburgh became an officer of Commercial Trust, that is, an Assistant Treasurer. From on or about November 15, 1971, up to and including February 6, 1974, the defendant Allison Fredenburgh was an Assistant Treasurer and the Branch Manager of the office located at 45th Street and Broadway, Bayonne, New Jersey.

3. At various times mentioned in this indictment, the defendant John McCarthy was a vice president of Bar-Mar Warehouse Co., Inc., and an employee of various other companies controlled by the defendant Anthony Gallagher.

4. At various times mentioned in this indictment, the unindicted co-conspirator Josephine Pasquale Johnson, was an employee of various companies controlled by the defendant Anthony Gallagher.

5. From at least as early as April 1, 1973 and continuously thereafter up to the date of this indictment, the exact dates being to the Grand Jury unknown, in the State and District of New Jersey and elsewhere, the defendants herein:

Anthony Gallagher,

John McCarthy, and

Allison Fredenburgh

did knowingly and wilfully combine, conspire, confederate and agree together and with each other and with Josephine Pasquale Johnson, an unindicted co-conspirator, and with other persons known and unknown to the Grand Jury, to commit the following offenses against the United States:

A. to knowingly and wilfully misapply moneys and funds in excess of $100.00 of the Commercial Trust Company of New Jersey with the intent to injure and defraud said bank, in violation of Title 18, United States Code, Section 656; and

B. to knowingly and wilfully make false statements upon applications for loans submitted to the Commercial Trust Company of New Jersey, for the purpose of influencing the action of said bank in approving loans, in violation of Title 18, United States Code, Section 1014.

6. It was part of said conspiracy that the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh would and did solicit and procure various third parties to apply for loans in their own names from Commercial Trust for benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh and others, and not for the benefit of the said third parties; said third parties being falsely assured by the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh that the defendant Anthony Gallagher would be responsible for the repayment of the loans.

7. It was further part of the conspiracy that the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh would and did apply for loans in the names of various third parties without their knowledge, and would thereafter use the proceeds of the loans for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh and others.

8. It was further part of the conspiracy that the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh would and did cause false statements to be made on various loan applications made to Commercial Trust as to the employment, salary and outstanding debt obligations of the third party borrowers in an effort to provide the defendant Allison Fredenburgh

with back-up documentation sufficient to justify the granting of the aforesaid loans.

9. It was further part of the conspiracy that the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh forged and caused to be forged signatures of third parties on loan applications and loan notes.

10. It was further part of the conspiracy that the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh would and did cause loans to be made by Commercial Trust in the names of the aforesaid third parties for the use and benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh and others, concealing from Commercial Trust the true purpose of said loans and the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh interest therein.

11. It was further part of the conspiracy that after the aforesaid loans in the names of third parties were granted, the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh would and did cause Commercial Trust to issue checks made payable to the said third parties, knowing that the proceeds of the checks were for the use and benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh and others, and not for the benefit of the said third parties.

## OVERT ACTS

In furtherance of the conspiracy and to effect the objects thereof, the defendants committed and caused to be committed the following acts:

1. On or before July 12, 1973, in Bayonne, New Jersey, the defendant Anthony Gallagher had a conversation with Peter J. Daly.

2. On or before July 12, 1973, in Bayonne, New Jersey, the defendant John McCarthy, gave Peter J. Daly a loan application.

3. On or about July 12, 1973, in Bayonne, New Jersey, the defendant Allison Fredenburgh approved a loan to Peter J. Daly.

4. On or before July 12, 1973, in Bayonne, New Jersey, the defendant Anthony Gallagher supplied the unindicted co-conspirator Josephine Pasquale Johnson with blank loan applications.

5. On or before July 12, 1973, in Bayonne, New Jersey, the unindicted co-conspirator Josephine Pasquale Johnson gave the defendant Anthony Gallagher a loan application form bearing the name of Victoria Squillante, as the purported borrower.

6. On or about July 12, 1973, in Bayonne, New Jersey, the defendant Allison Fredenburgh approved a loan and drew a check to the order of Victoria Squillante.

7. On or about July 30, 1973, in Bayonne, New Jersey, the defendant Allison Fredenburgh approved a loan in the name of Melody Slivocka.

8. On or about July 30, 1973, in Bayonne, New Jersey, the defendant Allison Fredenburgh approved the cashing of a check in the name of Melody Slivocka when he well knew that Melody Slivocka had not endorsed the aforesaid check.

9. On or about September 6, 1973, in Bayonne, New Jersey, the defendant Allison Fredenburgh approved a loan in the name of Robert J. Brennan.

10. On or about September 6, 1973, in Bayonne, New Jersey, the defendant Allison Fredenburgh approved the cashing of a check in the name of Robert J. Brennan when he well knew that Robert J. Brennan had not endorsed the aforesaid check.

All in violation of Title 18, United States Code, Section 371.

## COUNT II

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about July 24, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and
John McCarthy together

with the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $5,000.00 in the name of Mari Esposito which moneys and funds the defendants well knew were not for the benefit of Mari Esposito, but were for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

### COUNT III

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about July 24, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount

of $5,000.00 in the name of Rose De Nicola which moneys and funds the defendants well knew were not for the benefit of Rose De Nicola, but were for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

### COUNT IV

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about July 12, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $3,600.00 in the name of Victoria Squillante which moneys and funds the defendants well knew were not for the benefit of Victoria Squillante, but were for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

### COUNT V

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about May 22, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant,

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $3,500.00 in the name of Joan Ryan which moneys and funds the defendants well knew were not for the benefit of Joan Ryan, but were for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

### COUNT VI

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about August 3, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $7,500.00 in the name of Nicholas J. Palmisano which moneys and funds the defendants well knew were not for the benefit of Nicholas J. Palmisano, but were for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

### COUNT VII

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about June 27, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $5,000.00 in the name of Deborah A. Dominach which moneys and funds the defendants well knew were not for the benefit of Deborah A. Dominach, but were for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

## COUNT VIII

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about November 23, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $3,500.00 in the name of Jane Marie Kellner which moneys and funds the defendants well knew were not for the benefit of Jane Marie Kellner, but were for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

## COUNT IX

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about June 22, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $5,000.00 in the name of Gilbert R. Nonnenbacher which moneys and funds the defendants well knew were not for the benefit of Gilbert R. Nonnenbacher, but were for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

## COUNT X

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about June 25, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $5,000.00 in the name of Gilbert R. Nonnenbacher which moneys and funds the defendants well knew were not for the benefit of Gilbert R. Nonnenbacher, but were for the benefit of the defendants Anthony Gallagh-

er, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

## COUNT XI

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about July 30, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $3,500.00 in the name of Melody Slivocka which moneys and funds the defendants well knew were not for the benefit of Melody Slivocka, but were for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

## COUNT XII

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about July 30, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

knowingly and wilfully, did make a materially false statement in a loan application submitted to the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, for the purpose of influencing the action of said bank to approve a loan; in that, it was stated and represented in said loan application that Melody Slivocka was the borrower, when in truth and fact, as the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh well knew, she was not.

In violation of Title 18, United States Code, Section 1014.

## COUNT XIII

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about July 12, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $4,500.00 in the name of Peter J. Daly which moneys and funds the defendants well knew were not for the benefit of Peter J. Daly, but were for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

## COUNT XIV

1. That on or about September 14, 1973, at Bayonne, in the State and District of New Jersey, the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $3,500.00 in the name of Anthony Belis which moneys and funds the defendant well knew were not for the benefit of Anthony Belis, but were for the benefit of the defendant Allison Fredenburgh and others.

In violation of Title 18, United States Code, Section 656.

## COUNT XV

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about September 6, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

an Officer, that is, Assistant Treasurer and Branch Manager of the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, did knowingly and wilfully misapply and cause to be misapplied moneys and funds of said bank, with intent to injure and defraud the said bank, which moneys and funds were intrusted to the custody and care of said bank and to the custody and care of the defendant Allison Fredenburgh by causing to be disbursed proceeds of a loan in the amount of $5,000.00 in the name of Robert J. Brennan which moneys and funds the defendants well knew were not for the benefit of Robert J. Brennan, but were for the benefit of the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh, and others.

In violation of Title 18, United States Code, Section 656.

## COUNT XVI

1. Paragraphs 1 through 11 of Count I of this indictment are hereby realleged and incorporated as though set forth in full herein.

2. That on or about September 5, 1973, at Bayonne, in the State and District of New Jersey, the defendants

Anthony Gallagher and

John McCarthy together

with the defendant

Allison Fredenburgh,

knowingly and wilfully, did make a materially false statement in a loan application submitted to the Commercial Trust Company of New Jersey, a bank which had its deposits insured by the Federal Deposit Insurance Corporation, for the purpose of influencing the action of said bank to approve a loan; in that, it was stated and represented in said loan application that Robert J. Brennan was the borrower, when in truth and fact, as the defendants Anthony Gallagher, John McCarthy, and Allison Fredenburgh well knew, he was not.

In violation of Title 18, United States Code, Section 1014.